FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

98 SEP 30 PM 12: 17

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| THE RANCH HOUSE, INC., d/b/a THE PLATINUM CLUB, d/b/a THE PLATINUM ENTERTAINMENT CENTER, d/b/a THE PLATINUM SPORTS BAR, | ) ) ) ) ) | |
| | ) | CV 98-PT-1638-E |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| LARRY AMERSON, SHERIFF OF CALHOUN COUNTY, and THE CALHOUN COUNTY COMMISSION, a body politic as elective representatives of Calhoun County, a political subdivision of the State of Alabama, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

ENTERED

SEP 30 1998

## MEMORANDUM OPINION

This cause came on to be heard at a bench trial.  Without objection, the court,  pursuant to

Fed. R. of Civ. P. 65, advanced and consolidated the trial of this action on the merits with  a

requested hearing on plaintiff's application for preliminary injunction.  Trial was held on

August 24, 1998.

### Facts

The parties stipulated the facts which are pertinent to the issues submitted for decision by

1



the court. These facts include:[1]

4. Since 1993, the plaintiff has owned and operated an establishment known as the Platinum Club which, as its main attraction, provides entertainment consisting of topless and nude female dancing. The Platinum Club is not licensed to sell, serve, or otherwise provide for the distribution or consumption of alcoholic beverages in connection with the nude or topless dance performances conducted on its premises.

5. Neither the plaintiff's shareholder, Harvey Bowman, nor any manager, employee or entertainer, has been arrested or charged with an obscenity violation for activities at the Platinum Club.

6. The plaintiff further owns an adjacent facility known as the Platinum Sports Bar which is licensed to serve beer and wine.

7. The plaintiff's business is located in an unincorporated area of Calhoun County lying within the police jurisdiction of a municipality. The plaintiff has paid taxes to the City of Anniston, Alabama.

8. An occupied, single-family residential structure is located within 1,000 feet of the plaintiff's establishment.

13. Act No. 98-467 does not operate as a "total taking" of the plaintiff's property, and there are remaining economic uses to which the plaintiff might subject its property presently housing the Platinum Club.

14. There is, at present, land in Calhoun County, Alabama and elsewhere in the State of Alabama that is not within 1000 feet of one of the protected uses set forth in Section 13A-12-200.5(4).

15. The defendant Sheriff has, through his counsel, advised the plaintiff, through its counsel, of his intent to enforce the statute according to its terms should it be deemed constitutional, if the District Attorney agrees to prosecute such action.

No further evidence was offered at the trial by any party.

In its complaint, the plaintiff alleges that it, originally, operated a business which not only

---

[1]The court has used the paragraph numbers used by the parties in their Stipulated Facts.

provided live entertainment of erotic female dancers for its customers, but also sold beer and wine. In response to assertions by the City of Anniston, Alabama, plaintiff "reconfigured" its business by selling beer and wine in a building adjacent to the erotic dancing building.

## Plaintiff's Contentions

Plaintiff claims that the following provisions of 1998 enacted Alabama statutes constitute content-based restrictions on protected expression in violation of the First Amendment to the U. S. Constitution: Section 13A-12-200.11. Plaintiff emphasized at the hearing that its challenge to this section is based totally on facial invalidity.

Plaintiff further claims that the following provisions of the 1998 enacted Alabama statutes are unconstitutional as being facially violative of the First and Fourteenth Amendments to the U. S. Constitution: Section 13A-12-200.5(4). Plaintiff claims that said section is "overbroad, vague and without proper foundation."

Plaintiff had also claimed that Section 13A-12-200-12 violates the First and Fourteenth Amendments, but now acknowledges that this claim is not ripe for consideration.

## Statutory Provisions

Section 13A-12-200.11 reads as follows:

It shall be unlawful for any business establishment or any private club to show or allow to be shown for entertainment purposes the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state. A violation of this section shall be a Class C felony.

If a person is held under this section in the county jail, one-half of any fines collected and due to be deposited to the State General Fund for violations of

3

this section shall be paid by the comptroller to the General Fund of the county where the person is held for the operation of the county jail.

Section 1A-12-200.5(4) reads as follows:

It shall be unlawful for any person to operate an adult bookstore, adult movie house, adult video store, or other form of adult-only enterprise within 1,000 feet of a church, place of worship, church bookstore, public park, public housing project, daycare center, public or private school, college, recreation center, skating rink, video arcade, public swimming pool, private residence, or any other place frequented by minors. Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than ten thousand dollars ($10,000) and may also be imprisoned in the county jail for not more than one year.

Plaintiff acknowledges that its facility is an "adult-only enterprise" as defined in § 13A-12-200.1(3).

## Conclusions of Law

The facts are undisputed, so the sole issues are issues of law. The court will address each contested statutory provision.

## Section 13A-12-200.11

This issue is governed by the case of Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991) and subsequent cases which consider and apply Barnes.[2] The following quotes from Barnes are pertinent:

Several of our cases contain language suggesting that nude dancing of the kind involved here is expressive conduct protected by the First Amendment. In Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975), we said: "[A]lthough the customary 'barroom' type of nude dancing may

---

[2]Since the court is of the opinion that Barnes and subsequent Eleventh Circuit court cases control, it will not recite the history of cases leading up to Barnes. For a good discussion in this area, see Peliford v. Whisante, et al, CA 98-S-1967 - NE (N.D. Al. 1998). That case addresses the same statutes.

involve only the barest minimum of protected expression, we recognized in California v. LaRue, 409 U.S. 109, 118, 93 S.Ct. 390, 397, 34 L.Ed.2d 342 (1972), that this form of entertainment might be entitled to First and Fourteenth Amendment protection under some circumstances." In Schad v. Borough of Mount Ephraim, 452 U.S. p61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed2d 671 (1981), we said that "[f]urthermore, as the state courts in this case recognized, nude dancing is not without its First Amendment protections from official regulation" (citations omitted). These statements support the conclusion of the Court of Appeals that nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so.

Id. at 565-66.

. . . Respondents contend that while the state may license establishments such as the ones involved here, and limit the geographical area in which they do business, it may not in any way limit the performance of the dances within them without violating the First Amendment.

Id. at 566.

. . . Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Id., at 376-377, 88 S.Ct., at 1678-1679 (footnotes omitted) (citing U.S. v. O'Brien, 391 U.S. 367 (1968).

Id. at 567.

. . . Public indecency statues such as the one before us reflect moral disapproval of people appearing in the nude among strangers in public places.

Id. at 568.

This and other public indecency statutes were designed to protect morals and public order. The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and we have upheld such a basis for legislation. In Paris Adult Theatre I v. Slowdown, 413 U.S. 49, 61, 93 S.Ct. 2628, 2637, 37 L.Ed.2d 446 (1973), we said:

"In deciding Roth [v. United States], 354 U.S. 476 [77 S.Ct. 1304, 1 L.Ed.2d 1498](1957)], this Court implicitly accepted that a legislature could legitimately act on such a conclusion to protect 'the social interest in order and morality.] [Id.], at 485 [77 S.Ct., at 1309]." (Emphasis omitted.)

And in Bowers v. Handpick, 478 U.S. 186, 196, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986), we said:

"The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed."

Thus, the public indecency statute furthers a substantial government interest in protecting order and morality.

This interest is unrelated to the suppression of free expression. Some may view restricting nudity on moral grounds as necessarily related to expression. We disagree. It can be argued, of course, that almost limitless types of conduct--including appearing in the nude in public--are "expressive," and in one sense of the word this is true. People who go about in the nude in public may be expressing something about themselves by so doing. But the court rejected this expansive notion of "expressive conduct" in O'Brien, saying:

We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." 391 U.S., at 376, 88 S.Ct., at 1678.

Id., at 569-70.

But we do not think that when Indiana applies its statute to the nude dancing in these nightclubs it is proscribing nudity because of the erotic message conveyed by the dancers. Presumably numerous other erotic performances are presented at these establishments and similar clubs without any interference from the state, so long as the performers wear a scant amount of clothing. Likewise, the requirement that the dancers don pasties and a G-string does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic.

Id. at 570-71.

. . . It is without cavil that the public indecency statute is "narrowly tailored;"
Indiana's requirement that the dancers wear at least pasties and a G-string is
modest, and the bare minimum necessary to achieve the state's purpose.

Id. at 572.

Although such performance dancing is inherently expressive, nudity per se is
not. It is a condition, not an activity, and the voluntary assumption of that
condition, without more, apparently expresses nothing beyond the view that the
condition is somehow appropriate to the circumstances.

Id. at 581.

Justice Souter concurred in the judgment of "the opinion of the Court", but wrote

separately. Pertinent quotes from his opinion include:[3]

. . . I nonetheless write separately to rest my concurrence in the judgment, not on
the possible sufficiency of society's moral views to justify the limitations at issue,
but on the State's substantial interest in combating the secondary effects of adult
entertainment establishments of the sort typified by respondents' establishments.

It is, of course, true that this justification has not been articulated by Indiana's
legislature or by its courts. As the plurality observes, "Indiana does not record
legislative history, and the state's highest court has not shed additional light on
the statute's purpose," ante, at 2461. While it is certainly sound in such
circumstances to infer general purposes "of protecting societal order and
morality. . . from [the statute's] text and history," ibid, I think that we need not so
limit ourselves in identifying the justification for the legislation at issue here, and
may legitimately consider petitioners' assertion that the statute is applied to nude
dancing because such dancing "encourage] prostitution, increased] sexual assaults,
and attracts] other criminal activity." Brief for Petitioners 37.

Id. at 582.

_____

[3]It would appear that Judge Souter's opinion could be even stronger than "the opinion of
the Court" in that, while he apparently did not reject, at least not totally, the morality basis for the
Indiana law, he added a "secondary effects" basis. References to "secondary effects" generally
involve consideration of the public in general or surrounding neighborhoods. Perhaps it would
also be appropriate to consider the "secondary effects" on the dancers themselves.

. . . In my view, the interest asserted by petitioners in preventing prostitution, sexual assault, and other criminal activity, although presumably not a justification for all applications of the statute, is sufficient under O'Brien to justify the State's enforcement of the statute against the type of adult entertainment at issue here.

At the outset, it is clear that the prevention of such evils falls within the constitutional power of the State, which satisfies the first O'Brien criterion. See id., at 377, 88 S.Ct., at 1679. The second O'Brien prong asks whether the regulation "furthers an important or substantial governmental interest." Ibid. The asserted state interest is plainly a substantial one; the only question is whether prohibiting nude dancing of the sort at issue here "furthers" that interest. I believe that our cases have addressed this question sufficiently to establish that it does.

In Renton v. Playtime Theatre, Inc., 475 U.S. 41, 106 St. Ct. 925, 89 L.Ed.2d 29 (1986), we upheld a city's zoning ordinance designed to prevent the occurrence of harmful secondary effects, including the crime associated with adult entertainment, by protecting approximately 95% of the city's area from the placement of motion picture theaters emphasize "'matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas" . . . for observation by patrons therein.'" Id., at 44, 106 S.Ct., at 927. Of particular importance to the present enquiry, we held that the city of Renton was not compelled to justify its restrictions by studies specifically relating to the problems that would be caused by adult theaters in that city. Rather, "Renton was entitled to rely on the experiences of Seattle and other cities," Id., at 51, 106 S.Ct., at 931, which demonstrated the harmful secondary effects correlated with the presence "of even one [adult] theater in a given neighborhood." Id., at 50, 106 S.Ct., at 930; cf. Young v. American Mini Theatre, Inc., 427 U.S. 50, 71, n. 34, 96 S.Ct. 2440, 2453, n. 34, 49 L.Ed.2d 310 (1976)(legislative finding that "a concentration of 'adult' movie theaters causes the area to deteriorate and become a focus of crime"); California v. LaRue, 409 U.S. 109, 111, 93 S.Ct. 390, 393, 34 L.Ed.2d 342 (1972)(administrative findings of criminal activity associated with adult entertainment).

The type of entertainment respondents seek to provide is plainly of the same character as that at issue in Renton, American Mini Theatre, and LaRue. It therefore is no leap to say that live nude dancing of the sort at issue here is likely to produce the same pernicious secondary effects as the adult films displaying "specified anatomical areas" at issue in Renton. Other reported cases from the Circuit in which this litigation arose confirm the conclusion. See, e.g., United States v. Marred, 890 F.2d 924, 926 (CAN 1989)(prostitution associated with nude dancing establishment); United States v. Doer, 886 F. 2d 944, 949 (CAN 1989)(same). In light of Renton's recognition that legislation seeking to combat the secondary effects of adult entertainment need not await localized proof of

those effects, the State of Indiana could reasonably conclude that forbidding nude entertainment of the type offered at the Kitty Kited Lounge and the Glen Theatre's "bookstore" furthers its interest in preventing prostitution, sexual assault, and associated crimes.

Id. at 583-84.

. . .

. . .It is to say, rather, only that the effects are correlated with the existence of establishments offering such dancing, without deciding what the precise causes of the correlation actually are. It is possible, for example, that the higher incidence of prostitution and sexual assault in the vicinity of adult entertainment locations result from the concentration of crowds of men predisposed to such activities, or from the simple viewing of nude bodies regardless of whether those bodies are engaged in expression or not.

Id. at 585-86.

Because the State's interest in banning nude dancing results from a simple correlation of such dancing with other evils, rather than from a relationship between the other evils and the expressive component of the dancing, the interest is unrelated to the suppression of free expression.

. . .

. . . Similarly here, the "secondary effects" justification means that enforcement of the Indiana statute against nude dancing is "justified without reference to the content of the regulated [expression]," ibid. (emphasis omitted), which is sufficient, at least in the context of sexually explicit expression, to satisfy the third prong of the O'Brien test.

Id. at 586.

. . . Nor, so far as we are told, is the dancer or her employer limited by anything short of obscenity laws from expressing an erotic message by articulate speech or representational means; a pornographic movie featuring one of respondents, for example, was playing nearby without any interference from the authorities at the time these cases arose.

Id. at 587.

Applying Barnes and its O'Brien analysis, it is clear here that (1) the statutory provisions

9

are within the constitutional power of Alabama; (2) the provisions further an important and substantial governmental interest; and (3) the governmental interest is unrelated to the suppression of free expression. The only remaining issue is whether the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the governmental interest.

The fourth O'Brien-Barnes factor necessarily involves a consideration of the extent of opaque cover of body parts which the statute mandates. Pertinent to this issue are the following quotes from Cafe 207, Inc. v. St. Johns County, 856 F.Supp. 641 (M.D. Fla. 1994), affirmed, 66 F.3d 272, cert. denied, 417 U.S. 1156 (1996).[4]

> . . . The Plaintiff alleges that the nude dancing performed for its patrons is non-obscene, constitutionally protected communication; that the nude human body is a thing of beauty which, when combined with music and rhythmic motion in the form of dance, conveys an "important message of eroticism." The Plaintiff also claims that its promotion of nude dance and eroticism is, in part, a deliberate and intentional political protest against those who would choose to impose their narrow view of morality through legislation.
>
> . . .
>
> One distinctive feature of the ordinance is its definition of the terms "breast," buttocks," and "nudity." In net effect, a female is "nude" whenever more than two-thirds of the buttocks or more than three-fourths of the breasts are exposed: and detailed definitions of those body parts are provided to facilitate making the fractional measurements necessary in applying the ordinance to any given state of dress (or undress, as the case may be).

Id. at 643.[5]

_____

[4]As here, Cafe 207 involved a situation where no alcoholic beverages were served directly on site.

[5]While this court has not undertaken a geometric anatomical measurement analysis, it would appear that the exposure limitation in the Cafe 207 case was at least as restrictive as that in

Thus far in the analysis, therefore, applying <u>Barnes</u> to the facts of this case, it
is clear that the first three elements of the <u>O'Brien</u> four-part test are satisfied by
Ordinance 92-12. The law, as an exercise of the County's police power, is
clearly within its constitutional authority. It also serves a substantial and
important governmental interest in protecting order and morality <u>and</u>
in combating the secondary effects of nudity in adult entertainment establishments
of the sort typified by the Plaintiff's Cafe Erotica. And, neither of those
governmental interests is related to the suppression of free expression as such.

<u>Id.</u> at 644.

Evidence about secondary effects or, rather, the lack of them, is also clearly
foreclosed. It is now established as a matter of law by Supreme Court
jurisprudence culminating in <u>Barnes</u>, that secondary effects of proscribed conduct
may be taken into consideration by a court in evaluating the governmental
interests justifying impingement upon free speech rights even when, as in <u>Barnes</u>,
there is no legislative history demonstrating that the lawmakers actually
considered secondary effects or any other specific factor (such as protecting order
and morality) in enacting the challenged law.

<u>Id.</u> at.645.

The <u>Cafe 207</u> court dismissed the argument that <u>Barnes</u> only allows requirement of cover

by pasties and G-strings. The court stated:

In this case St. Johns County was not content with a law such as Indiana's in
which pasties and a G-string are sufficient to separate a state of lawful dress from
a state of unlawful nudity. Rather, the County's ordinance requires slightly, but
only slightly, more body covering than the Indiana statute validated in <u>Barnes</u>.
The Plaintiff argues, however, that precisely because the Court in <u>Barnes</u>
approved a regulatory statute which was satisfied by the wearing of pasties and a
G-string, the requirement of those articles of clothing in the <u>only</u> dress
requirement that can constitutionally be imposed on expressive dancing. This, I
believe, is a misreading of <u>Barnes</u>. All the court said in <u>Barnes</u>, in both the
plurality opinion and in the opinion of Justice Souter, was that an anti-nudity law
which is satisfied by the wearing of pasties and a G-string constituted a minimal
intrusion on the expressive content of dancing and was the minimum requirement
necessary to achieve the state's purpose. This is nothing more, after all, than a
practical recognition that there <u>are</u> no articles of clothing having less dimension

---

the Alabama statute.

than pasties and a G-string, and this implicit observation does not constitute a holding that pasties and a G-string are also the maximum requirements of dress that an anti-nudity ordinance may impose. The Court simply did not reach and did not decide that issue.

Id. at 645-46.

> ...Moreover, the Supreme Court has been "loath to second-guess the Government's judgment" with respect to the degree of regulation necessary to further the government's legitimate interests. Id., 492 U.S. at 478, 109 S.Ct. at 3034. (Emphasis added).

. . .

Once it is established that a burden may be imposed on the expressive content of erotic dancing by requiring some clothing--pasties and a G-string--then it does not seem to me from a constitutional standpoint that a modest increase in the amount of body covering required by the law really adds any significant, incremental burden on the expressive component of the dance. As Justice Souter observed, " . . . the limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message." Barnes, 501 U.S. at 586 111 S.Ct. at 2471. So, in this case, that erotic message may still be expressed with exposure of three-fourths of the breasts and two-thirds of the buttocks in the same manner it would be expressed while wearing pasties and a G-string. Or, even if there is some added incidental repression of speech, deference must be granted to the law making authority under Board of Trustees v. Fox, supra, in deciding the degree of regulation necessary to further the government's legitimate interests. (Emphasis added).

To be sure, so long as an anti-nudity statute is subject to say First Amendment scrutiny, i.e., an O'Brien evaluation, there must be a line in every case beyond which the law makers cannot go in requiring clothing or prohibiting exposure in some contexts. See DeWeese v. Town of Palm Beach, 812 F.2d 1365 (11th Cir. 1987)(striking down as an irrational violation of the plaintiff's liberty interests under the Fourteenth Amendment an ordinance requiring male joggers to wear shirts.) Definition of that constitutional line, however, must await a case-by-case development of the law and further guidance from the Supreme Court. Suffice it to say that Ordinance 92-12 of St. Johns County does not cross that constitutional boundary.

Id. at 646.

The Cafe 207 case rejected another argument raised by the plaintiff here. The court

stated:

... The Court began its analysis by noting that ordinarily "a person to whom a
statute may constitutionally be applied will not be heard to challenge that statute
on the ground that it may conceivably be applied unconstitutionally to others, in
other situations not before the Court." 413 U.S. at 610, 93 S.Ct. at 2915. The
court then acknowledged that First Amendment cases had come to be recognized
as an exception to the general rule and that litigants are permitted to raise
overbreadth claims when the "statute's very existence may cause others not before
the Court to refrain from constitutionally protected speech or expression." Id. at
612, 93 S.Ct. at 2916. The Court noted, however, that when First Amendment
overbreadth claims have been invoked against ordinary criminal laws that are
sought to be applied to protected conduct, the usual remedy is to reverse any
criminal conviction flowing from the law as unconstitutionally applied, not to
adjudicate that the law itself is facially invalid.

Id. at 647. [6]

---

[6]See also J&B Social Club No. 1, Inc. v. City of Mobile, 920 F.Supp. 1241 (S.D. Ala.
1996). See also American Booksellers v. Webb, 919 F.2d 1493, 1499 (11th Cir. 1990) where the
court stated:. . . Outside of the First Amendment context, the Supreme Court has noted the
difficulties inherent in a facial challenge:

that "[a] facial challenge to a legislative Act is, of course, the most difficult
challenge to mount successfully, since the challenger must establish that no set of
circumstances exist under which the Act would be valid. The fact that [the
challenged statute] might operate unconstitutionally under some conceivable set
of circumstances is insufficient to render it wholly invalid...."
United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

. . .

. . . Since the overbreadth doctrine in effect requires courts to evaluate the
potential reach of a statute, conceivable sets of circumstances, and possible direct
and indirect burdens on speech, "[t]he Supreme Court has noted that the
overbreadth doctrine is 'strong medicine' that should be employed only 'with
hesitation, and then "only as a last resort." ' " Upper Midwest Booksellers v. City
of Minneapolis, 780 F.2d 1389, 1391 (8th Cir.1986) (quoting New York v.
Ferber, 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982) (in turn
quoting Broadrick v. Oklahoma, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916-17, 37
L.Ed.2d 830 (1973)).

When the regulation is not directed at the origin of expression, or at the
ultimate right of a person (in this case, an adult) to present or procure protected
expression, it does not impinge upon "mere speech"; rather, it regulates the

13

> The principles distilled from these controlling decisions are that the
> overbreadth doctrine as an exception to the requirement of standing in First
> Amendment cases is to be sparingly applied; that this is especially true in cases
> like this one involving a criminal statute and a plaintiff whose asserted First
> Amendment interest constitutes expressive conduct as distinguished from
> protected pure speech; and for the overbreadth claim to be entertained in such a
> case the excessive scope of the statute or ordinance being reviewed must not only
> be real but substantial, and not subject to cure through case-by-case analysis and
> limiting judicial construction or partial invalidation.

Id at 648.

This court agrees with the holding in Cafe 207. The ultimate issue is the reasonableness

of the incidental restriction. In Iskon Miami, Inc. v. Metropolitan Dade County, 147 F.3d 1282,

1286 (11th Cir.. 1998), the court in addressing the reasonableness of restrictions on speech by a

government acting in a proprietary capacity in a nonpublic forum stated:

> . . . Restrictions must still be reasonable and "not an effort to suppress the
> speaker's activity due to disagreement with the speaker's view," Lee, 505 U.S. at
> 679, 112 S.Ct. 2701. At the same time, "[t]he restriction 'need only be
> reasonable; it need not be the most reasonable or the only reasonable limitation,'"
> Id. at 683, 112 S.Ct. 2701 (quoting Kokinda, 497 U.S. at 730, 110 S.Ct. 3115
> (plurality opinion)).

In Georgia Manufactured Housing v. Spalding County, 148 F.3d. 1304,  (11th Cir. 1998),

the court stated:

> The rational basis test consists of a two-prong inquiry:

---

method of presenting, or the form of, expression. Regulations on display affect
"conduct plus speech." Upper Midwest Booksellers, 780 F.2d at 1391-92;  M.S.
News Co. v. Casado, 721 F.2d 1281, 1289 (10th Cir.1983);  American
Booksellers Ass'n v. Rendell, 332 Pa. Super. 537, 581, 481 A.2d 919, 941 (1984).
"[W]hen conduct plus speech is involved, the overbreadth must be 'real' and
'substantial' in relation to [the regulation's] 'plainly legitimate sweep' before the
[regulation] should be invalidated on its face." Upper Midwest Booksellers, 780
F.2d at 1391-92 (quoting Ferber, 458 U.S. at 770, 102 S.Ct. at 3361-62).

> The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose-a goal-which the enacting government body could have been pursuing. The actual motivations of the enacting governmental body are entirely irrelevant.
>
> The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose. The proper inquiry is concerned with the existence of a conceivably rational basis, not whether that basis was actually considered by the legislative body. As long as reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational, the legislation survives rational-basis scrutiny.

Haves v. City of Miami, 52 F.3d 918, 921-22 (11th Cir. 1995)(internal quotations and citations omitted); see also, TRM, Inc. v. United States, 52 F.3d 941, 945-46 (11th Cir. 1995).

Further, that:

> Reasonable minds may differ as to where the line should be drawn or whether a line should be drawn at all, but the discretion to resolve that disagreement lies with the County, not the courts. Haves, 52 F.3d at 923-24.

Id. at 1307.

It is not up to courts to attempt to calibrate the exact line where opaque cover must begin.

The issue is whether a regulation unreasonably conflicts with protected expression. As Justice

Souter stated, "Nor, so far as we are told, is the dancer or her employer limited by anything short

of obscenity laws from expressing an erotic message by articulated speech or representational

means. . . ."

In Sammy's of Mobile , Ltd. v. City of Mobile, 140 F.3d 993, 998 (11th Cir. 1998), the

court stated:

> The Supreme Court, however, does not equate reference to content with
> suppression of content. The Court applies the Barnes-O'Brien intermediate level
> of scrutiny to ordinances which distinguish between nude and clothed
> entertainment, but which are aimed only at the secondary effects of nude
> entertainment. City of Renton v. Playtime Theatre, Inc., 475 U.S. 41, 48, 106
> S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (ordinance "by its terms [was] designed to
> prevent crime, protect city's retail trade, maintain property values, and generally
> protect and preserve the quality of the city's neighborhoods, commercial districts,
> and the quality of urban life"); Young v. American Mini Theatre, Inc., 427 U.S.
> 50, 71 n. 34, 96 S.Ct. 2440, 2453 n. 34, 49 L.Ed.2d 310 ("[i]t is [the] secondary
> effect [of crime and urban deterioration] which these zoning ordinances attempt to
> avoid, not the dissemination of 'offensive speech'").[7]

The court notes that the dancers can perhaps supplement their gyrations with talk which

can further convey their intended erotic message. At the hearing, the plaintiff stated that part of

the content of a dancer's message is, "I am available." The court does not reach the issue of

whether such a message is inherently illegal. If taken literally, it can certainly lead to the

secondary effects of prostitution, or violence by those who may be rejected.

The court notes, in retrospect, that its rather comical inquiry at trial with regard to the

perspective of the "top of the nipple" was not a first. See Dodger's Bar & Grill, Inc. v. Johnson

County Bd. of County Commissioners, 32 F.3d 1436, 1444-45 (10th Cir. 1994) where the court

stated:

> Amicus Platinum Club offers additional inventive hypotheticals in an attempt to
> demonstrate the ABC's vagueness. Amicus argues that the ABC provision

---

[7]The court does not reach the issue of whether the mere slight separation, in proximate
facilities, of the sale of alcoholic beverages and nude dancing is sufficient to overcome the
alcoholic beverages issues in Sammy's of Mobile, supra. Common sense indicates a continued
association. This court does not, however, rely on this association in reaching its decision. It is
not now entirely clear what the significance of alcohol sales is in such matters. See, however,
Sammy's of Mobile, supra.

16

prohibiting display or simulated display of the "female breast below the top of the nipple" is vague because it is

> equally amenable to at least two equally reasonable interpretations depending on whether the "top of the "nipple is construed to be the most cephalic point of the areola, (as might seem reasonable if for purposes of this section the subject person is to be viewed and analyzed while standing), or whether the top is construed as the most ventral point on the nipple, (as might seem reasonable if the subject person is to be viewed from a reclining or horizontal position).

Amicus Br. at 12-13. We agree with the defendants that this argument "ignores the common reference to the top of one's anatomy being in the vicinity of the head with a common understanding that the head does not change its relationship to the rest of the body if one lies down." Appellees' Br. at 31.

This court further notes that Dodger's Bar, in a decision substantially influenced by Twenty First Amendment considerations, upheld regulations substantially similar, if not more restrictive, than Section 13 A-12-200.11 here. While the Twenty First Amendment analysis, as such, may have no bearing here and may no longer be applicable in general, this court does note that the case did apparently consider whether the defendants had a rational basis for their regulation. The case also has a good discussion on overbreadthness and vagueness.

### Section 13A-12-200.5[8]

This issue is governed by the holding in Renton v. Playtime Theatre, Inc.,475 U.S. 41

(1986) and subsequent cases.

In Renton, the Court stated:

> Describing the ordinance as a time, place, and manner regulation is, of course, only the first step in our inquiry. This Court has long held that regulations

---

[8]At the trial the plaintiff acknowledged that, if the court upholds the constitutionality of Section 13A-12-200.11, this issue is moot. The court addresses it in the alternative.

enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment. See Carey v. Brown, 447 U.S. 455, 462-463, and n.7, 100 S.Ct. 2286, 1191, and n. 7, 65 L.Ed.2d 263 (1980); Police Dept. of Chicago v. Morley, 408 U.S. 92, 95, 98-99, 92 S.Ct. 2286, 2289, 2291-2292, 33 L.Ed. 2d 212 (1972). On the other hand, so-called "content-neutral" time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication. See Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); City Council of Lost Angeles v. Taxpayers for Vincent, 466 U.S. 789, 807, 104 S.Ct. 2118, 2130, 80 L.Ed.2d 772 (1984); Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 647-648, 101 S.Ct. 2559, 2563-2564, 69 L.Ed.2d 298 (1981).

Id. at 46-47.

It was with this understanding in mind that, in American Mini Theatre, a majority of this Court decided that, at least with respect to businesses that purvey sexually explicit materials, zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standards applicable to "content-neutral" time, place, and manner regulations. Justice STEVENS, writing for the plurality, concluded that the city of Detroit was entitled to draw a distinction between adult theaters and other kinds of theaters "without violating the government's paramount obligation of neutrality in its regulation of protected communication," 427 U.S. at 70, 96 S.Ct., at 2452, noting that "[i]t is th[e] secondary effect which these zoning ordinances attempt to avoid, not the dissemination of 'offensive' speech," id., at 71, n. 34, 96 S.Ct., at 2453, n. 34. Justice POWELL, in concurrence, elaborated:

"[The] dissent misconceives the issue in this case by insisting that
it involves an impermissible time, place, and manner restriction
based on the content of expression. It involves nothing of the kind.
We have here merely a decision by the city to treat certain movie
theaters differently because they have markedly different effects
upon their surroundings. . . . Moreover, even if this were a case
involving a special governmental response to the content of one
type of movie, it is possible that the result would be supported by a
line of cases recognizing that the government can tailor its reaction
to different types of speech according to the degree to which its
special and overriding interests are implicated.

Id. at 49.

18

. . . The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

. . .

. . . Moreover, the Renton ordinance is "narrowly tailored" to affect only that category of theaters shown to produce the unwanted secondary effects, thus avoiding the flaw that proved fatal to the regulations in <u>Schad v. Mount Ephraim</u>, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), and <u>Erznoznik v. City of Jacksonville</u>, 422 U. S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

. . .

. . . That Renton chose first to address the potential problems created by one particular kind of adult business in no way suggests that the city has "singled out" adult theaters for discriminatory treatment.

. . .

In sum, we find that the Renton ordinance represents a valid governmental response to the "admittedly serious problems" created by adult theaters.

<u>Id.</u> at 51-54.

In <u>International Eateries Of America, Inc. v. Broward County, Florida</u>, 941 F.2d 1157

(11th Cir. 1991), the court stated:

The regulation of non-obscene nude dancing often has been addressed in the federal courts. On several occasions, the Supreme Court has assumed, without deciding, that nude dancing is protected expression under the first amendment. See <u>Schad v. Borough of Mount Ephraim</u>, 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981)("nude dancing is not without its First Amendment protections from official regulation"); <u>see also Southeastern Promotions, Ltd. v. Conrad</u>, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); <u>Doran v. Salem Inn, Inc.</u>, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); <u>California v. LaRue</u>, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972). In a related context, the Supreme Court has held that under some circumstances cities may enact zoning ordinances that require adult movie theaters to locate only in certain areas, provided that the purpose of the regulation is to control the "secondary effects" of these businesses. See <u>City of Renton v. Playtime Theatre, Inc.</u>, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); <u>Young v. American Mini Theatre, Inc.</u>, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

<u>Id.</u> at 1159.

19

There has been considerable confusion in the Court's cases as to when each analysis should apply. In recent years, however, the Court has stated several times that "in the last analysis [the O'Brien test] is little, if any, different from the standard applied to time, place, or manner restrictions." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 298, 104 S.Ct. 3065, 3071, 82 L.Ed.2d 221 (1984); see also Barnes, 111 S.Ct. at 2460 (opinion of Rehnquist, C.J.) (noting the similarities and applying O'Brien); Ward v. Rock Against Racism, 491 U.S. 781, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989) (noting the similarities and applying time, place, and manner analysis). Although the wisdom of this trend toward a single standard has been questioned, see S. Williams, Content Discrimination and the First Amendment, 139 U.Pa.L.Rev. 615, 636-54 (1991), it is sufficient for our purposes that the Supreme Court has determined that under current Court doctrine the answer should be the same regardless of which analysis is used. Because we conclude that the ordinance at issue in this case more closely resembles the ordinance in Renton than the statute in Barnes, we follow Renton and apply time, place, and manner analysis.

Id. at 1161 n.2.

. . . In Renton, the Court recognized that a city's interest in protecting the quality of urban life from the secondary effects of adult businesses is indeed substantial. Renton, 475 U.S. at 50, 106 S.Ct. at 930. The distance ordinances prohibit the location of an "adult nightclub" within 500 feet of a residentially zoned district or 1000 feet of a church. The ordinances also specifically state that certain businesses have a "deleterious effect" on the residential and business areas around them and that the purpose of the ordinance is to "ensure that these adverse effects will not contribute to the blighting and downgrading of the surrounding neighborhood." Thus, the ordinances are aimed at the very type of harm that the Renton Court found to create a substantial government interest.

Id. at 1162.

We next address whether the distance ordinances are narrowly tailored to further the County's interest in combating the secondary effects of adult entertainment establishments. In Renton, the Court stated that the ordinance was narrowly tailored because it affected "only that category of theaters shown to produce the unwanted secondary effects. . . ." Renton, 475 U.S. at 52, 106 S.Ct. at 931. Here, the ordinances are of a similarly limited scope, focusing only on those businesses likely to produce secondary effects.

Id. at 1163.

In Americam Booksellers v. Webb, supra, 919 F.2d at 1500-01, the court stated:

> We decline to restate the bedrock case law and general principles of First
> Amendment jurisprudence which guide our analysis. We are content to note that
> (1) content-based restrictions on speech survive constitutional scrutiny only under
> extraordinary circumstances; but (2) material judged "obscene" under the
> appropriate constitutional standard is not protected by the First Amendment; (3)
> indirect burdens placed on protected speech in an effort to regulate obscenity must
> be supported by important state interests and should not be unnecessarily
> burdensome; and (4) the state's interest in protecting its youth justifies a limited
> burden on free expression. See generally Webb II, 643 F.Supp. at 1551-52 (and
> cases cited therein).
>
> . . .
>
> Several courts evaluating variously defined display regulations such as the
> instant one have emphasized that the state's legitimate interest in protecting its
> young must be balanced against the right of adults to have access to protected
> material. See, e.g., Upper Midwest Booksellers, 780 F.2d at 1394-95; Webb II,
> 643 F.Supp. at 1552. On the one hand, a state's interest in protecting children
> from exposure to material obscene as to minors is a substantial and important state
> interest. Ferber, 458 U.S. at 757, 102 S.Ct. at 3354-55 (1982); Ginsberg, 390
> U.S. at 639-42, 88 S.Ct. at 1280- 82. On the other hand, the indirect burden on
> adults' First Amendment right to have access to material not obscene for adults
> must be narrowly drawn. See Upper Midwest Booksellers, 780 F.2d at 1396-97
> (regulation must leave open adequate alternative channels, must not restrict
> expression at its source, and must not impose "significant" restrictions on adult
> access); M.S. News Co., 721 F.2d at 1288 (restriction on adults' access to
> material that is not obscene as to them must be reasonable); Rendell, 332
> Pa.Super. at 581, 481 A.2d at 941 ("incidental restrictions on First Amendment
> freedoms must be limited to those essential to the furtherance of that interest")
> (citation omitted).

Id. at 1500-01.

> We see no relevant distinction in this case between the constitutional standards
> applicable to a time, place, and manner restriction, and the balancing test
> described above for a regulation of speech unprotected as to minors that indirectly
> affects speech protected as to adults. In evaluating the display ban under either
> test, the crucial inquiry, at least in this case, is whether the restriction on adults'
> access to protected speech is unnecessarily burdensome or "significant," or, stated
> differently, whether alternate modes of adult access are unduly restricted.

Id. at 1502.

The overbreadth and vagueness doctrines are related yet distinct. M.S.
News Co., 721 F.2d at 1287.

> The vagueness doctrine is anchored in the Due Process Clauses of
> the Fifth and Fourteenth Amendments, and protects against
> legislation lacking sufficient clarity of purpose and precision in
> drafting. See Erznoznik v. City of Jacksonville, [422 U.S. 205,] at
> 217-218, 95 S.Ct. [2268,] at 2276-77 [45 L.Ed.2d 125 (1975) ];
> Grayned v. City of Rockford, 408 U.S. 104, 108-14 & n. 5, 92
> S.Ct. 2294, 2298-302 & n. 5, 33 L.Ed.2d 222 and n. 5 (1972).

Id. (footnote omitted). The vagueness doctrine focuses on whether the law in
question affords a "person of ordinary intelligence a reasonable opportunity to
know what is prohibited, so that he may act accordingly." Grayned, 408 U.S. at
108-109, 92 S.Ct. at 2298-99. "Overbroad legislation need not be vague, indeed it
may be too clear; its constitutional infirmity is that it sweeps protected activity
within its proscription." M.S. News Co., 721 F.2d at 1287 (citation omitted).

The overbreadth and vagueness doctrines are related in that "a court should
evaluate the ambiguous as well as the unambiguous scope of the enactment....
[since] ambiguous meanings cause citizens to ' "steer far wider of the unlawful
zone" ... than if the boundaries of the forbidden areas were clearly marked.' "
Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494
n. 6, 102 S.Ct. 1186, 1191 n. 6, 71 L.Ed.2d 362 (1982) (quoting Bagget v. Bullitt,
377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964); (in turn quoting
Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460
(1958)).

Id. at 1505-06.

The parties have stipulated that: "There is, at present, land in Calhoun County, Alabama

and elsewhere in the State of Alabama that is not within 1,000 feet of one of the protected uses

set forth in Section 13A-12-200.5(4)." Further, that: "Act No. 98-467 does not operate as a "total

taking" of the Plaintiff's property, and there are remaining economic uses to which the Plaintiff

might subject its property presently housing the Platinum Club."

The court concludes that either under a time, place and manner analysis or a secondary

effects analysis, section 13A-12-200.5 is facially valid and is not overbroad.[9]  The court will leave for another day any issues of inappropriate application.[10]

The court ultimately concludes that both contested statutory provisions pass First Amendment muster.  The plaintiff's complaint will be dismissed, with prejudice.

This ___ 30 ___ day of September, 1998.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[9]The emphasis on minors is certainly a reasonable emphasis.

[10]In order to illustrate the widespread governmental interest in the subject matter and to further illustrate the comparative reasonableness of Section 13A-12-200.11, the court asked its law clerk to compile some of the statutes and ordinances which are similar to said section.  This compilation is attached as Exhibit A.

23

## EXHIBIT A

**State Statutes Regarding Public Nudity and Coverage Required in Adult Establishments:**

*Indiana Statutes*

35-45-4-1 Public indecency; indent exposure
Sec. 1. (a) A person who knowingly or intentionally, in a public place:

....

(3) appears in a state of nudity, . . . commits public indecency, a Class A misdemeanor.

(b) "Nudity" means the showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering, **the showing of the female breast with less than a fully opaque covering of any part of the nipple**, or the showing of covered male genitals in a discernibly turgid state.

Ind. Code Ann. §35-45-4-1 (Burns 1994).

*Tennessee Statutes*

Section 39-13-511  Public indecency -- Indecent exposure.
(a)(1)(A) A person commits the offense of public indecency who, in a public place, as defined in subdivision (a)(2)(B), knowingly or intentionally:

. . . (ii) Appears in a state of nudity. . .

(2) As used in subdivision (a)(1):

(A) "Nudity" or "state of nudity" means the showing of the bare human male or female genitals or pubic area with less than a fully opaque covering, **the showing of the female breast with less than a fully opaque covering of the areola**, or the showing of the covered male genitals in a discernibly turgid state.  "Nudity" or "state of nudity" does not include a mother in the act of nursing the mother's baby. . .

Note:  'Public place' is defined so as to include commercial establishments of all types.

Tenn. Code Ann. §39-13-511(a) (Supp. 1994)

*New Mexico Statutes*

30-9-14.1  Indecent dancing.

Indecent dancing consists of a person knowingly and intentionally exposing his intimate parts to public view while dancing or performing in a licensed liquor establishment. "Intimate parts" means the mons pubis, penis, testicles, mons veneris, vulva, female breast or vagina.  As used in this section, **"female breast" means the areola**, and "exposing"

does not include any act in which the intimate part is covered by any nontransparent material.

Whoever commits indecent dancing is guilty of a petty misdemeanor.

A liquor licensee, his transferee or their lessee or agent who allows indecent dancing on the licensed premises is guilty of a petty misdemeanor and his license may be suspended or revoked pursuant to the provisions of the Liquor Control Act.

N. M. Stat. Ann. 30-9-14.1 (Michie 1994).

Note:   New Mexico also has a similarly worded provision regulating "indecent waitering."
N. M. Stat. Ann. 30-9-14.2 (Michie 1994)

*Louisiana Revised Statutes*

14:106. Obscenity
A. The crime of obscenity is the intentional:
(1) Exposure of the genitals, pubic hair, anus, vulva, or **female breast nipples**[1] in any public place or place open to the public view with the intent of arousing sexual desire or which appeals to prurient interest or is patently offensive.

....

E. This Section does not preempt, nor shall anything in this Section be construed to preempt, the regulation of obscenity by municipalities, parishes, and consolidated city-parish governments; however, in order to promote uniform obscenity legislation throughout the state, the regulation of obscenity by municipalities, parishes, and consolidated city-parish governments shall not exceed the scope of the regulatory prohibitions contained in the provisions of this Section.

La. Rev. Stat. Ann. §14:106 (West 1986).

*Michigan Statutes*
(example of a set of statutes allowing villages and cities to regulate public nudity)

67.1
Sec. 1. A village subject to this act has, in addition to other powers that are conferred, the general power and authority granted in this chapter. The council of a village subject to this act may enact ordinances relating to the powers described in this section as it considers proper, including, but not limited to, ordinances relating to 1 or more of the following:

....

(aa) To regulate or prohibit public nudity within village boundaries. As used in this

---

[1] In State v. Jacobson, 459 So.2d 1285 (Ct. App. Louisiana 1985), writ denied 463 So.2d 599, breast nipples were considered "exposed" in violation of the statute even though the nipples were covered with translucent tape during performances.

subdivision, "public nudity" means knowingly or intentionally displaying in a public place, or for payment or promise of payment by any person including, but not limited to, payment or promise of payment of an admission fee, any individual's genitals or anus with less than a fully opaque covering, or **a female individual's breast with less than a fully opaque covering of the nipple and areola.** Public nudity does not include any of the following:

> (i) A woman's breastfeeding of a baby whether or not the nipple or areola is exposed during or incidental to the feeding. . .

117.5h. Public nudity; regulation or prohibition by ordinance

> (1) Whether or not so provided in its charter, a city may, by ordinance, regulate or prohibit public nudity within city boundaries.
> (2) As used in this section, "public nudity" means knowingly or intentionally displaying in a public place, or for payment or promise of payment by any person including, but not limited to, payment or promise of payment of an admission fee, any individual's genitals or anus with less than a fully opaque covering, or **a female individual's breast with less than a fully opaque covering of the nipple and areola.** A women's breastfeeding of a baby does not under any circumstances constitute nudity irrespective of whether or not the nipple is covered during or incidental to the feeding.

Mich. Comp. Laws §§ 67.1, 117.5h (1991).

*Mississippi Statutes*

19-5-103. Regulation of massage parlors and public displays of nudity.

(1)   In accordance with the provisions of section 19-3-41, providing that additional powers may be conferred upon the boards of supervisors, the boards of supervisors of any county bordering on the Gulf of Mexico and having two (2) judicial districts and the board of supervisors of any county adjacent to any county of this or any adjoining state wherein is located a city having a population in excess of two hundred thousand (200,000), according to the latest federal census, are hereby empowered. . . to promulgate, adopt and enforce ordinances which are necessary and reasonable for the protection of public health and the maintenance of order in relation to public displays of nudity.

(2)   . . . For the purposes of this section the term "nudity" means uncovered, or **less than opaquely covered**, postpubertal human genitals, pubic areas, the **postpubertal human female breast below a point immediately above the top of the areola**, or the covered human male genitals in a discernibly turgid state. For purposes of this definition, a female breast is considered uncovered if the nipple only or the nipple and areola only are uncovered.

For the purposes of this section the term "public display" means the exposing, exhibiting, revealing, or in any fashion displaying the nude human body or any representation thereof in any location in such a manner that it may be readily seen by the public by normal unaided vision and the term also means any play, motion picture, dance, show or other presentation, whether pictured, animated or live, performed before an audience and which in whole or in part depicts or reveals nudity or sexual conduct.

Miss. Code Ann. §19-5-103 (1994).

**County and City Ordinances Outlining the Coverage Required:**

*Jackson, Mississippi*

The City Ordinance prohibits persons physically present in public places from knowingly or intentionally: (1) engaging in sexual intercourse; (2) appearing in a state of nudity; or (3) fondling the genitals of himself, herself, or another person. "Nudity" is defined as "the showing of the human genitals, anus, or **the female nipple**."[2]  Persons "engaged in expressing a matter of serious literary, artistic, scientific or political value," are excepted from the Ordinance's reach ("the exception"). Supervisors, managers, owners, and employers of a person who appears in a state of nudity may be guilty of a misdemeanor.

*Johnson County, Kansas*
(Licensing ordinance supported, in part, by 21st Amendment arguments)

Resolution 67-92, Art. IV of the Adult Entertainment Code of Johnson County, Kansas states: (SECTION 1) A. No person shall, **on licensed premises**, perform acts of or acts which constitute or simulate . . . (3) The displaying of post-pubertal human genitals, buttocks, or

---

[2] See J & B Entertainment, Inc. v. City of Jackson, Mississippi, 1998 WL 518388 (5th Cir.(Miss.) 1998). In discussing the amount of covering required, the court stated:

The plurality opinion in Barnes upheld the ban on public nudity under [the fourth O'Brien] prong because it found Indiana's requirements to be reasonable: "Indiana's requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose." Barnes, 501 U.S. at 57, 111 S.Ct. at 2463. Justice Souter expressed a similar view: "Pasties and a G-string moderate the expression to some degree, to be sure, but only to a degree. Dropping the final stitch is prohibited, but the limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message." Id. at 587, 111 S.Ct. at 2471.

We too find the City's restrictions to be reasonable. Jackson's Ordinance defines "nudity" as "the showing of the human genitals, anus, or the female nipple." J&B's dancers presumably could avoid violating the Ordinance by wearing pasties and a G-string that covered their nipples, anuses, and genitalia. Thus, J&B's dancers may have ample avenues of communication open to express their erotic message; they would be prevented only from "dropping the final stitch." Barnes, 501 U.S. at 587, 111 S.Ct. at 2471 (Souter, J., concurring). Although not being permitted to drop that final stitch may decrease the number of patrons who desire to see the dancing at Legends Cabaret, "[t]he inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression." Young, 427 U.S. at 78, 96 S.Ct. at 2456 (Powell, J., concurring). Accordingly, we conclude that Jackson has satisfied O'Brien 's fourth criterion.

J & B Entertainment, Inc. v. City of Jackson, Mississippi, 1998 WL 518388 (5th Cir.(Miss.) 1998).

pubic area, or the **female breast below the top of the nipple**.[3]
The regulations apply to night clubs serving alcohol in unincorporated Johnson County.

*Newport, Kentucky*

Ordinance 0-91-25
**The Bikini Ordinance:**
Sec. 4-81. Persons prohibited from performing nude or nearly nude activities.
It shall be unlawful for, and a person is guilty of, performing nude or nearly nude activity when that person appears on a business establishment's premises in such a manner or attire as to expose to view any portion of the pubic area, anus, vulva or genitals, or any simulation thereof, or when any female appears on a business establishment's premises in such manner or attire as to expose to view **the portion of the breast below a horizontal line across the top of the areola at its highest point** or simulation thereof. This definition shall include the entire lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breast, exhibited by a dress, blouse, shirt, leotard, bathing suit, or other wearing apparel provided the areola is not exposed in whole or in part.

---

[3] See Dodger's Bar and Grill, Inc. v. Johnson County Board of County Commissioners, 32 F.3d 1436 (10th Cir. 1994) (holding that 21st Amendment takes precedence over any 1st Amendment interest in expression). The Court analyzed the Barnes/O'Brien issues as follows:

Plaintiffs essentially offer two overbreadth arguments. First, they rely on Barnes in asserting that the AEC restrictions on displaying buttocks and the female breast below the top of the nipple are greater than needed to further the defendants' interest. This argument rests in large part on their observation that the AEC prohibits some attire, such as thong bikinis, that can legally be worn in some public places. Plaintiffs also claim that many bikini styles do not cover what could be considered part of the buttocks, and question whether the AEC requires that a dancer in an "adult entertainment club" wear more clothing than someone in a public swimming area.

Plaintiffs reason that if the Supreme Court held in Barnes that a regulation requiring dancers to wear a G-string and pasties was constitutional, then an ordinance requiring any more physical coverage must necessarily be unconstitutional and void. We do not agree. As the Court noted in Barnes, a requirement that dancers wear some clothing 'does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic.' The Court certainly did not hold that an ordinance requiring dancers to wear something more than G-strings and pasties would be unconstitutional. As we have noted, the county commission has broad power to regulate the service of alcohol, and the state's power to regulate alcohol outweighs the marginal First Amendment interest in totally nude dancing and other conduct prohibited by the AEC. We have no doubt that under the broad powers of the Twenty-First Amendment the county commission can require more clothing be worn by erotic dancers in an establishment serving liquor than by citizens on the street or beaches.

Dodger's Bar and Grill, Inc. v. Johnson County Board of County Commissioners, 32 F.3d 1436 (10th Cir. 1994).

Sec. 4-82. Licensees prohibited from permitting nude or nearly nude activities.

A licensee or retail licensee is guilty of performing nude or nearly nude activity when, having control of the business establishment's premises, which it knows or has reasonable cause to know is being used by any person to appear on the premises in such manner or attire as to expose to view portions of the pubic area, anus, vulva or genitals, or any simulation thereof, or used by any female to appear on the premises in such manner or attire as to expose to view any portion of the breast below a horizontal line across the top of the areola at its highest point or simulation thereof. This definition shall include the entire lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breast exhibited by a dress, blouse, shirt, leotard, bathing suit, or other wearing apparel provided the areola is not exposed in whole or in part. It permits such activity or fails to make reasonable and timely effort to halt or abate such activity or fails to make reasonable and timely effort to halt or abate such activity or use.

**Public Nudity Ordinance**:

Section 17.44

A.    It shall be unlawful for a person to appear in any public place in such a manner or attire as to expose to view any portion of the pubic area, anus, vulva or genitals, or any simulation thereof, or for any female to appear in such manner or attire as to expose to view **the portion of the breast below a horizontal line across the top of the areola** at its highest point or simulation thereof. This definition shall include the entire lower portion of the human female breast, but shall not include any portion of the cleavage of the human female breast exhibited by a dress, blouse, shirt, leotard, bathing suit, or other wearing apparel provided the areola is not exposed in whole or in part.[4]

B.    That any person who shall violate this Ordinance shall be guilty of a Class B Misdemeanor and shall be subject to fine and/or imprisonment as provided in the Kentucky Revised Statutes for a Class B Misdemeanor.

'Public Place', as used in this Ordinance is defined as:

[A] place to which the public or a substantial group of persons has access and includes but is not limited to highways, apartment houses and hotels not constituting rooms or apartments designed for actual residence. An act is deemed to occur in a public place if it produces its offensive or proscribed consequences in a public place.

---

[4]See Bright Lights, Inc. v. City of Newport, 830 F.Supp. 378 (E.D. Kentucky 1993) (holding ordinance constitutional). In Bright Lights, owners and operators of establishments in Newport, Kentucky brought action challenging constitutionality of the ordinances regulating adult entertainment. On cross motions for summary judgment, the District Court, Bertelsman, Chief Judge, held that: (1) ordinances requiring erotic dancers to wear bikini top did not impose restriction on First Amendment freedoms greater than essential to furtherance of city's interest in improving its image, and (2) provisions of adult entertainment ordinance imposing strict liability upon licensees for acts occurring on their premises and providing for license revocation upon occurrence of any condition which is nuisance or obnoxious to morals and general welfare of public were invalid.

*City Council of South Burlington , Vermont*

Public Indecency Ordinance

Section 3. Definitions.
"Nudity" shall mean the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque **covering of any portion of the nipple**, or the depiction of covered male genitals in a discernibly turgid state.

Section 4. Public Indecency.
a. No person shall knowingly or intentionally in a public place:

....

2. appear in a state of nudity;

....

b. No person who owns, leases or controls property shall knowingly allow any person to engage in the conduct described in subparagraph a. above at any time such property is open to the public.[5]

*Schenectady, New York*

The City of Schenectady, New York has two local laws that govern Plaintiffs' business activities. The City's Public Amusement Law regulates specific entertainment businesses and prohibits any person from exposing certain portions of the human body. In addition, the City Zoning Law requires that all "adult entertainment businesses" must be established, subject to the issuance of a Special Permit, solely within two designated zoning districts--districts G and H--as defined by the City Zoning Law.

Schenectady City Code Section 128-8 outlines the exposure provisions:
A.    It shall be unlawful for any female person to appear, work, entertain, act or display herself in any cabaret, dance hall, bar, tavern, lounge, discotheque or restaurant clothed or costumed in such a manner that **a portion of the breast below the top of the areola** is not covered with a fully opaque covering or in such a manner that the genitals, pubic area or buttocks are not covered with a fully opaque covering.

....

C.    It shall be unlawful for any person to knowingly conduct, maintain, own, lease, manage, operate or furnish any cabaret, dance hall, bar, tavern, lounge, discotheque or restaurant where a female or male person is not clothed, costumed or covered as required herein.

---

[5] In SBC Enterprises, Inc. v. City of South Burlington, 892 F.Supp. 578 (D. Vermont 1995), operators of a proposed nightclub brought an action to enjoin enforcement of city ordinance prohibiting public nudity. The city filed a motion for judgment on the pleadings as to certain claims, which was treated as motion for summary judgment. The District Court, Gagliardi, Senior District Judge, held that the above ordinance was valid under the First Amendment.

See Nakatomi Investments, Inc. v. City of Schenectady, 949 F.Supp. 988 (N.D. N.Y. 1997).

*Chattanooga, Tennessee*

CHATTANOOGA CITY CODE §25-85

(a) Definitions. As used in this section, the following terms shall have the meanings indicated:

Public place shall include: streets, sidewalks or highways; transportation facilities; schools; places of amusement; parks, playgrounds; restaurants; nightclubs; cocktail lounges; burlesque houses; bars; cabarets; taverns; taprooms; private fraternal, social, golf or country clubs; or any place that allows the consumption of intoxicating beverages on the premises.

Wholly or substantially exposed to public view, as it pertains to breasts, shall mean the showing of the female breast, in a public place, with **less than a fully opaque covering of any portion of the breast below the top of the nipple.**

(b) Prohibited acts. It shall be unlawful for any person to perform in a public place, or for any person who owns or operates premises constituting a public place to knowingly permit or allow to be performed therein, any of the following acts or conduct:

....

(3) The actual or simulated public displaying of the pubic hair, anus, vulva or genitals;

(4) The appearance by any female in a public place so costumed or dressed that one or both breasts are wholly or substantially exposed to public view, or any owner or operator of premises constituting a public place knowingly permitting or allowing any such person to appear on the premises owned or operated by him. [6]

*St. Tammany Parish, Louisiana*

The amendments to Chapter 3 of the St. Tammany Code of Ordinances read as follows:

SEC. 3-139.01 Disorderly Conduct

No person holding a retail dealer's permit, and no servant, agent, or employee of the permittee, shall participate in or allow any nude or partially nude dancer, host, hostess, waiter or waitress on the premises, whether in the capacity as an employee, entertainer, guest, invitee, patron, or otherwise.

DEFINITIONS:

"Nude" or "Partially Nude" is defined as less than completely or opaquely covered and exposing:

a) Human genitals, pubic region;

b) All of the buttocks area;

c) **Female breast area below a point immediately above the top of the areola.**

SEC. 3-176.01 Disorderly Conduct

------

[6]Found in DCS, Inc. v. City of Chattanooga, 914 F.Supp. 193 (E.D. Tenn. 1995).

No person holding a retail dealer's permit, and no servant, agent, or employee of the permittee, shall participate in or allow any nude or partially nude dancer, host, hostess, waiter or waitress on the premises, whether in the capacity as an employee, entertainer, guest, invitee, patron, or otherwise.

DEFINITIONS:

"Nude" or "Partially Nude" is defined as less than completely or opaquely covered and exposing:

a) Human genitals, pubic region;

b) All of the buttocks area;

c) **Female breast area below a point immediately above the top of the areola.[7]**

*Tucson, Arizona*

Tucson City Ordinance Section 11-25.1 provides:

Any female entertaining or performing any dance or in any play, exhibition, show or other entertainment, or any female serving food or spirituous liquors as defined by A.R.S. title 4, chapter 1, article 1, as amended, in a restaurant, nightclub, bar, cabaret, tavern, tap room, theater, or in a private, fraternal, social, golf or country club, as defined by A.R.S. title 4, chapter 1, article 1, as amended, or in any public place, who appears clothed, costumed, unclothed or uncostumed in such a manner that **the nipple and the areola [sic] (the more darkly pigmented portion of the breast encircling the nipple) are not firmly covered by a fully opaque material**, is guilty of a misdemeanor.[8]

*Vermillion, Ohio*

Codified Ordinance of the City of Vermilion

666.18 CONDUCT PROHIBITED IN ADULT CABARETS

(a) No person shall knowingly or intentionally in an adult cabaret:

....

(2) Appear in a state of nudity in view of others;

....

(b) No employee appearing on the premises of an adult cabaret in a state of semi-nudity shall have any physical contact with any other employee or with a customer of such adult cabaret.

(c) Any employee appearing on the premises of an adult cabaret in a state of semi-nudity must be on a stage that is at least forty-five inches (45") above floor level and that is removed at least six feet (6') from the nearest other employee and/or customer.

---

[7] See Vonderhaar v. Parish of St. Tammany, 633 So.2d 217 (La. Ct. App. 1993) (finding, after a review of the jurisprudence construing various parish and municipal ordinances which are more restrictive than that contained in Title 26, that the amendments to Chapter 3 are not in direct violation of any Louisiana prohibitory law).

[8] City of Tucson v. Wolfe,  917 P.2d 706 (Ct. App. Ariz. 1995).

....

(i) As used in this section, "nude" or "nudity" means exposing to view the human male or female genitals or pubic area with less than a fully opaque covering, **the showing of the female breast below a point immediately above the top of the areola with less than a fully opaque covering of the areola and nipple**, or the showing of the covered male genitals in a discernibly turgid state. **"Covering" means any clothing or wearing apparel, including pasties, but does not include any substance that can be washed off the skin, such as paint or make-up, or any substance designed to simulate the appearance of the anatomical area beneath it.**

(j) As used in this section, **"semi-nude" or "semi-nudity" means exposing to view, with less than a fully opaque covering, any portion of the human female breast below the top of the areola** or any portion of the buttocks. **This definition shall include the entire lower portion of the female breast, but shall not include any portion of the cleavage of the female breast exhibited by a dress, blouse, shirt, leotard, bathing suit or other clothing, provided that the areola is not exposed in whole or in part.** [9]

*Akron, Ohio*

As of May, 1994, Akron, Ohio's public indecency ordinance provided:

Akron City Code § 133.06.
(A) No person shall knowingly or intentionally, in a public place:
....
(3) Appear in a state of nudity. . .
(B) For the purpose of this section only, the following definitions shall apply:
"Nudity " means the showing of the human male or female genitals or pubic area with less than a fully opaque covering, the **showing of the female breast with less than a fully opaque covering of any part of the nipple**, or the showing of the covered male genitals in a discernibly turgid state.
"Public Place " means any street, sidewalk, right of way and any public or private building or place where the general public is invited.[10]

*Erie, Pennsylvania*

Ordinance 75-1994
Section 1....

---

[9] Found in Threesome Entertainment v. Strittmather,  4 F.Supp.2d 710 (N.D. Ohio 1998).

[10]See Triplett Grille,, Inc. v. City of Akron, 40 F.3d 129, 131 (6th Cir. 1994) (holding ordinance constitutional as applied to prohibit nude dancing at clubs, despite the claim that it was not enacted to combat the secondary effects of adult entertainment, and holding the ordinance unconstitutional in that it banned nudity in all public places in an overly broad manner and without limitation).

1. A person who knowingly or intentionally, in a public place:

....

c. appears in a state of nudity, . . . commits Public Indecency, a Summary Offense.
2. "Nudity" means the showing of the human male or female genital, pubic area or buttocks with less than a fully opaque covering;  **the showing of the female breast with less than a fully opaque covering of any part of the nipple**;  the exposure of any device, costume, or covering which gives the appearance of or simulates the genitals, pubic hair, natal cleft, perineum anal region or pubic hair region;  or the exposure of any device worn as a cover over the nipples and/or areola of the female breast, which device simulates and gives the realistic appearance of nipples and/or areola.
3. "Public Place" includes all outdoor places owned by or open to the general public, and all buildings and enclosed places owned by or open to the general public, including such places of entertainment, taverns, restaurants, clubs, theaters, dance halls, banquet halls, party rooms or halls limited to specific members, restricted to adults or to patrons invited to attend, whether or not an admission charge is levied.[11]

*Pittsburg, Kansas*

The City of Pittsburg, Kansas: Ordinance No. G-741.
Section 4 of the ordinance reads as follows:

The following conduct by a licensee, a licensee's manager, employee, or agent, or by an independent contractor hired by a licensee or hired by a licensee's manager, employee or agent, or by any person with the approval, permission, acquiescence, or tolerance of a licensee or a licensee's manager, employee, or agent, if occurring on the licensed premises, is deemed contrary to the public health, safety, morals, and welfare, is unlawful, and is hereby prohibited:

A) Knowingly exposing to the view of another person or knowingly permitting any person to remain on the licensed premises who exposes to the view of another person,

i) the human male or female genitals, pubic area, pubic hair, anal cleft or cleavage of the buttocks, or

ii) **any portion of either the nipple of the female breast or the female vulva**, or

iii) any portion of the male penis or the penis in a discernible erect state, even if completely or opaquely covered. . .[12]

*Kane County, Illlinois*

7/17/97 Chi. Trib. 1
1997 WL 3568836
Chicago Tribune

---

[11] Found in Pap's A.M. v. City of Erie, 674 A.2d 338 (Commonwealth Ct. of Penn. 1996).

[12] Found in DPR, Inc. v. City of Pittsburg, 953 P.2d 231 (Ct. App. Kansas 1998).

The county recently passed a public nudity ordinance drafted by Assistant State's Atty. Bob Sandner, who said he modeled much of it on one in St. John's County, Fla.

That ordinance prohibits nude dancing in public places, regardless of whether they serve liquor. As a backup, the county also passed an adult entertainment special-use zoning ordinance.

According to Sandner, the public nudity ordinance defines what areas of the body must be covered. For instance, **one-fourth of the breast must be covered**, as must one-third of the buttock.

*Sparta, Wisconsin*

> 1/28/98 Grand Rapids Press 1
> 1998 WL 8110973
> The Grand Rapids Press

> Village Council members have adopted an ordinance prohibiting public nudity.  The ordinance defines public nudity as "knowingly or intentionally displaying in a public place . . . any individual's genitals . . . with less than fully opaque covering, or **a female individual's breasts with less than fully opaque covering.**"

> A "public place" is defined as "out-of-doors land and areas open to the general public, including public streets and alleys and all buildings rooms, theaters, athletic grounds, bars, dance halls and lounges open to the public."

*Fairfax, Virginia*

> Wash. Post D01
> 1993 WL 2089305
> The Washington Post

> The new law specifies what must not be left exposed both below and above the waistline, but the pertinent part would ban "a state of undress so as to expose . . . **the female breast with less than a fully-opaque covering of any portion thereof below the top of the nipple.**"

> It is modeled after a similar ordinance in Virginia Beach, a resort town known for vigorous prosecution of female sun-bathers who sport skimpy "thong" swimsuit bottoms.

*Trenton, Wisconsin*

> Town of Trenton Ordinance No. 10 states:
> AUTHORITY:
>> This ordinance is enacted pursuant to power granted by virtue of present Wisconsin Statutes, including Section 125.10.

RESTRICTIONS:

There shall be no public nudity at a public licensed establishment.

DEFINITION:

Nudity means the showing or exposing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple.

Public means any place of accommodation or amusement, which shall be interpreted broadly to include, but not be limited to, places of business or recreation, hotels, motels, resorts, restaurants, taverns and any place where accommodations, amusement, goods or services are available either free or for a consideration. Campgrounds are also included.

[Use of public bathrooms and hotel rooms is not limited by this provision]

VIOLATION.

Each violation of this ordinance shall result in a forfeiture.... [V]iolation constitutes sufficient grounds for board consideration of license suspension, revocation, or nonrenewal where such violation occurred in conjunction with or related to the activity licensed for.[13]

*Westerly, Rhode Island*
(upheld under 21ˢᵗ Amendment)

The Westerly Code of Ordinances, ch. 1070, art. V, §§ 7-89 (1994) prohibits exposure of any portion of the female breast **below the top of the areola in any "commercial establishment** located within the Town of Westerly, Rhode Island., **at which alcoholic beverages are offered for sale** for consumption on the premises." Wreck Bar, Inc. v. Comolli, 857 F.Supp. 182 (D. Rhode Island 1994) (upholding Ordinance under 21ˢᵗ Amendment).

*Fond Du Lac County, Wisconsin*
(Example of licensing ordinance supported, in part by the 21ˢᵗ Amendment)

CABARET ORDINANCE §1 (May 16, 1989).

SECTION I
CABARET LICENSE
(Entertainment Featuring Dancing)

1. License required. No holder of a class 'B' liquor, beer license, or dance hall within the unincorporated area of Fond du Lac County shall afford to their patrons: entertainment which specifically features or advertises dancing by the performance of any act, stunt or dance by performers under the auspices of the management, whether such dancers are paid or not unless the owner shall first have obtained a Cabaret License from the County Clerk.

....

5. Regulations:

....

(o) The dancers must wear clothes or costumes which shall at a minimum consist of the following: be of non-transparent material, the top portion of the costume worn by females **must completely cover the areola of the breast** and the lower

---

[13]See Lounge Management, Ltd. v. Town of Trenton, 580 N.W.2d 156 (Wis. 1998) (holding ordinance overbroad and thus unconstitutional)

portion of the costume worn by both male and female dancers must completely cover the pubic area and cleavage of the buttocks.[14]

*Mobile, Alabama*
(21st Amendment supported licensing ordinance)

Ordinance 03-003 of the City of Mobile, Alabama

It shall be unlawful for any manager, officer, agent, servant, employee, or person in charge of any establishment within the City of Mobile or the police jurisdiction thereof, licensed to sell spirituous or vinous liquors or malt or brewed beverages under the laws of the State of Alabama, knowingly to exhibit, suffer, allow, permit, engage in, participate in, or be connected with, any motion picture, show, performance, or other presentation upon the licensed premises, which, in whole or in part, depicts nudity or sexual conducts or any simulation thereof.

Any person, firm or corporation convicted for violating this ordinance shall be fined not more than $500.00 and sentenced to imprisonment for a period not exceeding six months, at the discretion of the court trying the case.

The ordinance defines "nudity" as:
[T]he showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering, or **the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the darkened area surrounding the nipple**, or the depiction of covered male genitals in a discernibly turgid state.[15]

*Coates, Minnesota*
(21st Amendment supported licensing ordinance)

Coates, Minn. City Ordinances SS 603.01, 603.02 (1978):
603.01, PURPOSE. The City of Coates does hereby ordain that it is in the best interest of the public health, safety and general welfare of the people of the City of Coates that certain types of entertainment, as hereinafter set forth, be prohibited upon the premises of licensed liquor and beer establishments so as to best protect and assist the owners and operators and employees thereof, as well as the patrons thereof and the public in general. Further, the City does ordain that the standards set herein are reflective of the prevailing community standards in the City of Coates.

603.02, CERTAIN ACTS PROHIBITED. It shall be unlawful for any licensee to permit or to suffer any person or persons from being upon the licensed premises when such person does not have his or her buttocks, anus, **breast** and genitals covered with a

---

[14] Found in Fond du Lac County v. Mentsel, 536 N.W.2d 160 (Ct. App. Wisc. 1995).

[15] Found in Sammy's of Mobile, Ltd. v. City of Mobile, 140 F.3d 993 (11th Cir. 1998).

non-transparent material.[16]

---

[16] Found in Knudtson v. City of Coates, 519 N.W.2d 166 (Minn. 1994).