

FILED

JUN 2 9 2001

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

|                          |     |                   |
|--------------------------|-----|-------------------|
| THE RANCH HOUSE, INC.,   | )   |                   |
|                          | )   |                   |
|     Plaintiff,           | )   |                   |
|                          | )   |                   |
| vs.                      | )   | CV-98-PT-1638-E   |
|                          | )   |                   |
| LARRY AMERSON, et. al.,  | )   |                   |
|                          | )   |                   |
|     Defendants.          | )   |                   |
|                          | )   |                   |

ENTERED

JUN 2 9 2001

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came to be heard at a second trial on June 4, 2001, upon the remand from the

United States Court of Appeals for the Eleventh Circuit.

## BACKGROUND

On April 29, 1998, the Governor of Alabama approved Act No. 98-467 of the Alabama

Legislature, which amended Division 5 of Chapter 12 of the Alabama Criminal Code, § 13 A-12-

200.1, *et. seq.*, Code of Alabama 1975, also known as the "Alabama Anti-Obscenity Enforcement

Act." The plaintiff filed this action on June 25, 1998, challenging Ala. Code §§ 13A-12-200.11

and 13-A-200.5(4), new additions to Division 5. The parties totally stipulated the pertinent facts

during the first trial, which was conducted on August 24, 1998. This court issued its first decision

on September 30, 1998, found at Ranch House, Inc. v. Amerson, 22 F. Supp. 2d 1296 (N.D. Ala.

1998). The pertinent stipulated facts include[1]:

---

[1] The court used the paragraph numbers used by the parties in their Stipulated Facts. At the first trial, the parties did not offer any evidence other than as stipulated. At the second trial, the parties agreed to the same stipulated

43

4. Since 1993, the plaintiff has owned and operated an establishment known as the Platinum Club which, as its main attraction, provides entertainment consisting of topless and nude female dancing. The Platinum Club is not licensed to sell, serve, or otherwise provide for the distribution or consumption of alcoholic beverages in connection with the nude or topless dance performances conducted on its premises.

5. Neither the plaintiff's shareholder, Harvey Bowman, nor any manager, employee or entertainer, has been arrested or charged with an obscenity violation for activities at the Platinum Club.

6. The plaintiff further owns an adjacent facility known as the Platinum Sports Bar which is licensed to serve beer and wine.

7. The plaintiff's business is located in an unincorporated area of Calhoun County lying within the police jurisdiction of a municipality. The plaintiff has paid taxes to the City of Anniston, Alabama.

8. An occupied, single-family residential structure is located within 1,000 feet of the plaintiff's establishment.

13. Act No. 98-467 does not operate as a "total taking" of the plaintiff's property, and there are remaining economic uses to which the plaintiff might subject its property presently housing the Platinum Club.

14. There is, at present, land in Calhoun County, Alabama and elsewhere in the State of Alabama that is not within 1000 feet of one of the protected uses set forth in Section 13A-12-200.5(4).

15. The defendant Sheriff has, through his counsel, advised the plaintiff, through its counsel, of his intent to enforce the statute according to its terms should it be deemed constitutional, if the District Attorney agrees to prosecute such action.

The plaintiff claimed that § 200.11 is an unconstitutional content-based restriction of free

expression, and that § 200.5(4) is an unconstitutional denial of access to protected expression.[2]

The defendants contend that both sections are constitutional because they target, not the content

_____

facts and offered additional evidence.

[2] The plaintiff originally also challenged § 13A-12-200.12, pertaining to licensing and advertisement regulations for adult bookstores. Prior to the hearing before this court, however, counsel for both parties agreed that it is not yet ripe for review. The parties have taken the same position at the second trial.

2

of nude dancing, but the negative secondary effects of nude dancing on the surrounding community. The defendants further contend that neither section is unconstitutionally vague or substantially overbroad. This court's ruling of September 30, 1998 upheld both statutes, concluding that, under the negative secondary effects doctrine, both statutes were not content-based restrictions on free expression, and that § 200.5(4) was a reasonable time, place, and manner restriction that was not overbroad. Ranch House, 22 F. Supp. 2d at 1305-1306, 1309-1310.

## THE ELEVENTH CIRCUIT OPINION

The plaintiff filed an appeal from this court's ruling on October 28, 1998. The plaintiff also moved for an injunction pending appeal to avoid enforcement of the statutes at issue. This court's stay was dissolved by its own language on December 2, 1998. On the same day, the Eleventh Circuit granted an injunction pending resolution of the appeal. The injunction is still in place.

The matter was first argued before a panel of the Eleventh Circuit in February of 1999. That panel deferred its decision in the case until after the Supreme Court issued its opinion in City of Erie v. Pap's A.M., 529 U.S. 277, 120 S. Ct. 1382 (2000). After the Pap's decision was rendered, however, the first Eleventh Circuit panel found that it could not reach a majority decision and reassigned this case to a different panel.

In an opinion dated January 17, 2001, the Eleventh Circuit vacated this court's September 30, 1998 ruling and remanded the case, by a mandate dated February 22, 2001, for further evidentiary development and findings of fact beyond the facts as stipulated by the parties. Ranch House v. Amerson, 238 F.3d 1273, 1288 (11th Cir. 2001). In short, the court decided that the

3

parties had not presented sufficient facts, albeit fully stipulated, to allow this court to conclude

that, when the Alabama legislature passed § 200.11, it actually had considered the negative

secondary effects of nude dancing establishments and had drafted the statute to combat those

negative secondary effects. Id. at 1283. Additionally, the circuit court remanded the case so that

this court could further consider the potential overbreadth of the scope of § 200.11. Id. at 1285-

1286. The court also gave the State of Alabama the opportunity to participate in the proceedings

and to help the defendants develop an evidentiary foundation for their negative secondary effects

defense.[3] Finally, the plaintiff was given the opportunity to mount "as applied" challenges, even if

not previously asserted, to both §§ 200.11 and 200.5(4). Id. at 1284, 1288. In so doing, the

Eleventh Circuit highlighted several issues for this court to consider and, concerning which, to

make specific findings. This court will enumerate them here and then discuss them separately

later in this opinion. The issues specifically to be addressed are:

    1) The availability of the negative secondary effects doctrine as to § 200.11. Id. at 1284.

    2) Whether, regardless of its success under the negative secondary effects doctrine, § 200.11 would fail the intermediate scrutiny test set forth in United States v. O'Brien, 391 U.S. 367, 88 S. Ct. 1673 (1968), because it proscribes too much protected expression. Ranch House, 238 F.3d at 1285.

    3) If the plaintiff mounts an "as applied" challenge to § 200.11, whether the statute is unconstitutional as applied to the plaintiff. Id. at 1284.[4]

    4) If § 200.5(4) were to be found to be a reasonable time, place, and manner restriction, whether § 200.5(4) is nevertheless unconstitutional as applied to the plaintiff because it does not contain an express, or sufficient, amortization clause for existing businesses. Id.

---

    [3] The State of Alabama declined to participate, after notice, in the first trial. It has now appeared and participated.

    [4] At the second trial, plaintiff stated that it does not mount an "as applied" challenge to § 200.11.

at 1287.

5) If § 200.5(4) were to be found to be a reasonable time, place, and manner restriction, whether enforcing the § 200.5(4) zoning regime would immediately substantially suppress all such protected speech, and, if so, whether the statute would cut off public access to such speech and, therefore, be unconstitutional. Id. at 1287-1288.

6) If § 200.5(4) were to be found to be a reasonable time, place, and manner restriction, whether the statute is nevertheless unconstitutional because of the lack of safeguards, within the statute, to protect adult entertainment businesses from the "purposeful encroachment" of uses protected by the statute that would operate to drive adult entertainment businesses out of Calhoun County. Id. at 1288, 1288 n. 10.[5]

This court initially set this matter for trial on May 17, 2001. The parties jointly requested

a continuance for various reasons relating to the availability of witnesses, etc. The court

conducted the trial on June 4, 2001.

## CONTENTIONS OF THE PARTIES

The plaintiff first argues that "[t]he legislative history [of § 13A-12-200.11] in no manner

reveals a "secondary effects" concern or purpose with the enactment of [§ 200.11]. . . ." The

plaintiff further argues that the defendants should not be permitted to present evidence, outside

the official legislative record, that the legislature intended to combat secondary effects when

passing the statute. It claims that the Supreme Court of Alabama refuses to consider such

evidence when attempting to determine legislative intent, citing James v. Todd, 103 So. 2d 19,

28-29 (Ala. 1958), and Eagerton v. Terra Resources, Inc., 426 So. 2d 807, 809 (Ala. 1958). The

plaintiff contends that, pursuant to Erie Railroad Company v. Tompkins, 304 U.S. 64, 78

(1937)("Except in matters governed by the U.S. Constitution or by Acts of Congress, the law to

---

[5] At the second trial, the parties agreed that these are the correctly stated issues. See Court Exhibit 1. As indicated, the plaintiff raises only a facial challenge to § 200.11 and both facial and as-applied challenges to § 200.5(4). It may be that the overbreadth challenge to § 200.11 is, of necessity, a facial challenge.

5

be applied in any case is the law of the State. And whether the law of the State shall be declared by its legislature in a statute or by its highest court in a decision is not a matter of federal concern.") and Kirby v. Tennessee Valley Authority, 877 F. Supp. 589, 591 (N.D. Ala. 1994)("The purported evidence therein proffered by individual members of the legislature is inadmissible to prove legislative intent for the reason that it is well settled that the intent of the legislature is expressed in the Statute, and the motives of individual members of the legislature or the intentions of draftsmen, or of any other person, will not be looked into by the court if their motives or intentions are not expressed in the Statute, and the Court will not be influenced by their views or opinions."), this court cannot consider any evidence other than the official legislative record.

The defendants argue that the Eleventh Circuit's express instructions in Ranch House allow this court to evaluate not only the official legislative record, but also "a wide variety of materials, including the text of the statute, any preamble or express legislative findings associated with it, legislative history, and studies and information of which legislators were clearly aware." 238 F.3d at 1280 (emphasis added). They also note that the circuit court indicated that, in order to meet the evidentiary burden of proof, the defendants' showing was required, at minimum, to "consist[] of nothing more than proof that the legislature reasonably relied on findings reported elsewhere suggesting a link between the proscribed expression and negative secondary effects." Id. at 1283. The defendants contend that, pursuant to the law of the case doctrine, the Eleventh Circuit's instructions regarding the kinds of materials that this court may examine to determine legislative intent is the "law of the case," and that this court should not follow the plaintiff's interpretation of the Alabama Supreme Court's decisions, citing U.S. v. Robinson, 690 F.2d 869,

872 (11th Cir. 1982). The defendants also argue that this case is distinguishable from the cases that the plaintiff cites, in which the federal courts were <u>applying a state law</u>, were required to <u>interpret the terms of the state statute in order to do so</u>, and were bound by the state's chosen method of <u>statutory interpretation</u>. In the instant, purely federal case, the defendants argue, legislative intent is a question of fact, which the Eleventh Circuit remanded for resolution, and is unrelated to the interpretation of the provisions of the state law. They maintain that evidence extrinsic to the official legislative record is necessary to demonstrate legislative intent when the constitutionality of the statute is at issue, and that the Supreme Court routinely admits such evidence in order to make such a determination, citing <u>Village of Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252, 268 (1977)(contemporary statements by members of decisionmaking body, minutes of meetings, reports, and in extraordinary instances, individual testimony of legislative purpose "highly relevant.") and <u>Wallace v. Jaffree</u>, 472 U.S. 38, 57 (1985)(testimony of state senator's intent regarding purpose in passing legislation providing for voluntary prayer in public schools used as evidence of legislative intent, in order to invalidate state statute under Establishment Clause).

The defendants further contend that, even if this court were bound by the Alabama Supreme Court's rules for statutory interpretation, it may still examine evidence extrinsic to the official record where the expression of legislative intent within the text of the statute is insufficient to determine that intent, citing <u>City of Montgomery v. Montgomery City Lines</u>, 49 So. 2d 199, 211 (Ala. 1950)("[T]he purpose of a statute will be illustrated by its origin, countemporaneous [sic] history, the prior condition of the law, as well as the general powers and course of legislation."), and <u>In re Upshaw</u>, 23 So. 2d 861, 863 (Ala. 1945)("'[I]t is a well-settled rule of

7

interpretation . . . that it is permissible in ascertaining [the legislature's] purpose and intent to look to the history of the times, the existing order of things, the state of the law when the instrument was adopted, and the conditions necessitating such adoption.'")(quoting Houston County v. Martin, 169 So. 2d 13, 16 (Ala. 1936)). The defendants note that in recent cases before the Alabama Supreme Court that required a determination of legislative intent, the court did not limit itself to the statute's official record, but instead looked to federal and state laws that were contemporaneous with the statute in question, but extrinsic to it; United States Supreme Court cases that existed when the legislature passed the law; and, on one occasion, the entire history of Alabama legislation upon the subject matter of a particular law. Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc., 746 So. 2d 966 (Ala. 1999); Siegelman v. Chase Manhattan Bank (USA), 575 So. 2d 1041 (Ala. 1991). The defendants argue that, although the "motives or reasons" of a single legislator may be irrelevant to the inquiry, and the views of individual legislators will not be used to contradict express legislative intent within the statute, the Alabama Supreme Court has, in one instance, used the testimony of a statute's drafter to interpret the statute's terms, citing Mitchell v. Probate Court, 689 So. 2d 17 (Ala. 1997). The defendants suggest that the Alabama Supreme Court's actions in Mitchell would allow this court to use testimony of individual legislators to determine "'the state of the law when the instrument was adopted, and the conditions necessitating . . . adoption.'"

## FINDINGS OF FACT

At the second trial, the parties further stipulated:

1. 43,560 square feet = 1 acre
2. The formula for determining the area of a circle, and the definition of Pi.
3. There are 200 parcels of land in Calhoun County containing 72 acres or more, but this

8

number does not include contiguous parcels in separate sections that could be combined to create at least 72 acre parcels.[6]

Two witnesses testified at the trial in person. The defendants called witness Donna

Norton, who testified substantially to the following:

Norton is a real estate agent in Calhoun County, Alabama. She located 5 properties listed for sale in Calhoun County through the real estate Multiple Listing Service, a computer database. Five printouts, one for each property, were introduced as defense exhibits E1-E6. All properties were available as of June 3, 2001 (the day before the trial).

E1: 80 Acres on Highway 9 in Calhoun County. Price: $360,000.

E2: 350 Acres in Piedmont on County Road 19. Price: $750,000.

E3: 83 Acres in White Plains area of Calhoun County. Price: $402,600.

E4: 75 Acres on Alexander/Jacksonville Highway in Calhoun County. Price: $225,000.

E5: 366 Acres off of Hwy. 41 in Ohatchee area of Calhoun County. Price: $120,000.

These lists include neither properties for sale "by owner," nor properties that people list with real estate agents, but request that they be kept out of the Multiple Listing Service. Ms. Norton did not know of any other properties for sale in Calhoun County that exceed 72 acres, but she knew of two parcels in neighboring Cleburne County that fit these specifications.

Ms. Norton highlighted the five Calhoun County properties on a map and numbered them.

Some properties may be sold subject to restrictions, which may be specified on the deed.

The properties listed are not zoned "Commercial" (there are no zoning ordinances outside the municipality), but are listed in the Multiple Listing Service under "Farm acreage," instead of "Commercial." No available "Commercial" listings in the listing service contain acreage in excess of 10 acres. If not restricted in some way, the land in "Farm Acreage" could be used for commercial purposes.

There is no indication that, in 1998, these properties were available for sale.

Ms. Norton did not know the "configurations" of the five properties.

Ms. Norton could not testify to the availability of other transportation, such as regular bus service.

Ms. Norton did not know of anyone engaged in business that would buy just 72 acres.

Ms. Norton would characterize this land as "rural."

The plaintiff called rebuttal witness Phillip Ledbetter, who testified substantially to the

following:

_____

[6] The parties apparently agree that 72 acres in a perfect circle would allow for the location of a facility at its center which would be 1000 feet from all points on the circumference.

9

Mr. Ledbetter is a licensed real estate agent and licensed real estate broker. He owns and invests in real estate. His real estate agency is a "full service" agency, dealing in commercial, residential, and industrial use properties. He specializes in commercial properties.

After reviewing the 5 available properties (he actually reviewed 6, but the defendants did not proffer one of them through Ms. Norton), Mr. Ledbetter concluded that there are no properties available that would satisfy the 1000 foot boundary restriction and would be suitable for a use of this sort.

Mr. Ledbetter arrived at his conclusion because, in the "real world," the plaintiff would have to purchase 160 acres of land instead of 72 acres of land, based upon how real estate to be sold is divided. Most real estate is described by the quarter, and is sold by, first, dividing that quarter into quarters. A quarter of a quarter is 1320 square feet square. That quarter will further be divided into a half of a quarter (of a quarter), which will be a rectangular shape, 2640 feet long and 1320 feet wide. Assuming that protected uses occupy parcels of land directly next to the parcel in question, an adult entertainment business that bought a parcel in this shape would run afoul of the restriction because it would not have sufficient room on either side of the property's 1320-foot width.

Mr. Ledbetter believes that it would be economically unfeasible for a business of the plaintiff's sort to buy 160 acres simply to run one business because of the cost of property taxes, unused property, infrastructure, etc.

He admitted that, theoretically, this problem could be cured by simply buying 340 more feet on either side. It is even theoretically possible to buy a strict 72-80 acres. However, according to Mr. Ledbetter, in the "real world," a seller either will not sell a strict 72 acres, or will make the buyer pay, for 72 acres (in such a shape as to satisfy the statute), however much the seller was asking for the 160 acres in "quarter shape," or some other ridiculously high price.

Mr. Ledbetter's opinion of the availability of suitable properties may change if the property in question is adjacent to an unprotected use, such as a national forest.

Mr. Ledbetter further testified that eight nude or semi-nude dancing clubs that have operated in Calhoun County, but have since closed, would, in his opinion, violate the statute if they were still open. He has performed no measurements to support his opinion. He believes that the Platinum Club is also in violation of the statute.

Mr. Ledbetter believes that the five available properties would also be unsuitable/unprofitable for a club of this sort because of their undesirable location, topography, roads, traffic flow, and demographics, although he admitted that the current location of the Platinum Club does not have the best traffic flow, location, and lighted roads. He agreed that an adult entertainment establishment like the Platinum Club probably does not require a high amount of visibility, easy access, etc.

Mr. Ledbetter acknowledged that there are no zoning ordinances in unincorporated Calhoun County, so that the 5 properties in question could be used for commercial purposes. He maintained that the poor terrain would create difficulties in the building of any kind of commercial use on these properties, but agreed that improvements could be made so that, at least theoretically, it would be possible to locate a club on them. However, he does not believe that it would be profitable to do so.

10

Witnesses Tom Butler, an Alabama State Senator, testified by deposition as follows:

Senator Butler is the Alabama State Senator from Madison County, Limestone County, and Morgan County. He has served as a state senator since 1994, and has been the majority leader in the Alabama Senate since 1999. He was the sponsor of the Act containing the two statutory sections at issue, which, at the time he sponsored it, was labeled Senate Bill 607 ("SB 607").

Senator Butler sponsored the SB 607 because of "problems that had been growing in Madison County since about 1991 with the proliferation of clubs outside the corporate limits of Huntsville to the rural areas." Initially, local governments tried to remedy the problem through "local bills." These local laws, passed by the county commission, were ineffective because they could carry no criminal penalty. The club owners simply ignored them. Later, the Alabama legislature found it necessary to amend the child labor laws to prohibit the employment of underage dancers in the clubs. Another statute was passed to prohibit the sale of alcoholic beverages in establishments offering nude entertainment. After the amendment the child labor laws was passed, Senator Butler concluded that, in order to address the problems still present in Madison County, and, he discovered, similar problems in Houston County, Mobile County, and Calhoun County, a state-wide bill was needed.

Senator Butler felt that since the bill was going to be a statewide bill, he needed more background material to support the bill on the floors of the legislature. He, therefore, asked the Madison County sheriff to give him incident reports related to problems at these clubs during a six-month period of time. He intended that these reports, detailing emergency (911) police responses to club-related incidents, would be used to support a statewide act. Senator Butler recalls that the information from the sheriff's office showed the police responding to "drugs, knifings, shootings, fights, just about anything you can think of that were in these reports." Senator Butler also believes that the legislative action behind SB 607 responded to the need for the prior legislation, already passed, that had addressed the problem of underage dancers in adult clubs, as well as to the club owners' ignoring previously passed local legislation. He recalls sharing all of this information with state legislators both in committee and on the senate floor.

Senator Butler contacted Madison County District Attorney ("DA") Tim Morgan, and the Madison County sheriff, and asked for recommendations for a statewide act that would impose criminal penalties. The district attorney made recommendations to the Madison County delegation from the Senate, which sent the recommendations to the Legislative Reference Service at the Alabama House of Representatives, in order to develop SB 607. The Legislative Reference Service actually drafted the bill. The bill was filed during the next legislative session, and introduced in the state senate. Senator Butler requested the recommendation from the DA's office because "we [the legislature] were so frustrated at the time, trying to deal with this on our own, essentially not being attorneys, trying to wrestle with this just representing the communities' desire to have these places stop creating problems that were created . . . [we] asked him to make a recommendation as a law enforcement officer . . . to take care of the problems here in Madison County and any other problems in the state . . . ." These specific problems, according to Senator Butler, were "the strain on the sheriff's budget and the number of calls he was having to make, the increase in knifings and shootings and drug trafficking and prostitution in the rural areas, we had

11

to deal with those kinds of things. Even using minors in the clubs, that concerned this community. And the noise . . . with children sleeping next door; we tried to do everything we could. We accepted our district attorney's recommendation as this is what this community needs to do and statewide to address this problem, and we made a case in the legislature and passed the act." Again, later, Senator Butler stated that, with regard to the DA's recommendations, "Specifically, I was looking for what it would take in a statewide act that would cover our problems here in Madison County. And the other areas that were having problems obviously would be covered under a statewide act, but I wanted to make sure that we had a statewide act, that it would do what we wanted to do here in Madison County, to control the proliferation of knifings and shootings and stabbings and disturbances of the peace and employment of children in these establishments in the rural areas of Madison County." Senator Butler believed that the nude and topless dancing "was the magnet that was drawing people to the rural areas."

Senator Butler recalled that the language in § 200.5(4) specifically was intended to protect minors from exposure to adult entertainment and its trappings, such as advertisements clearly offering nude dancing and "free lap dances." Section 200.5(4) was intended "to keep these kinds of establishments away from young people, wherever young people might frequent, and this was an enumeration of several places where you would find children from day care on up age-wise."

Section 200.11 was intended to address the proliferation of clubs that offered bottomless and topless dancers "as drawing cards," and "the attendant problems that were associated with that, signage on the road was offensive to people in the community, they were disturbing the peace. . . . We had an increase in drug traffic associated with this. increase in the number of calls the sheriff's office was receiving. . . . This was a drain on the sheriff's office, the peace at night in these rural areas was being disturbed by these places operating until two and three o'clock in the morning, and quite frankly, the community was sick of it."

With regard to the recommendations made by the Madison County District Attorney's Office and the Madison County Sheriff's Office, the date of the facsimile transmission from the District Attorney's Office was May 6, 1997. Senator Butler requested the recommendations from the DA's office prior to May 6, 1997. The attorney who wrote the recommendations was Jennie Cole, an assistant DA. Senator Butler never directly spoke to Ms. Cole. However, he read the memorandum containing her recommendations, and, afterward, sent it to the Legislative Reference Service. According to Senator Butler, he and the other legislators relied upon the DA's office's word that the recommendations adequately would address the perceived problems. They specifically accepted the recommendations as "legal advice" regarding the actions necessary to remedy the problems.

When asked whether the legislature had considered "studies" that compared the negative effects from totally nude establishments with those from regular bars and dance clubs, Senator Butler responded that the only studies performed were examinations of incident calls to the Madison County sheriff's office related to certain "adult" clubs. When asked whether this "study" specifically was what prompted him to call the DA's office and ask for a recommendation, Senator Butler replied that "This data was collected to support what we already knew; we knew there was a ton of calls. My knowing that would not necessarily be enough to convince a Senate committee or on the Senate floor; I wanted to be able to show them calls that our sheriff's office had to make out in the rural areas relative to these clubs and what they were doing out there."

12

The Madison County reports of emergency (911) calls to the sheriff's office were the only calls that were examined in the study. Senator Butler stated that he had no specific personal knowledge of problems relating to adult entertainment in other counties, although he speculated that prior local legislation had been passed (which, again, he had found to be ineffective in addressing the problems in Madison County) in Houston, Calhoun, and Mobile Counties.

With regard to the materials that are still available to show what the legislature considered when it passed the Act, the only documents still available are the published legislative history, the compilation of the calls to the Madison County Sheriff's Office, and the facsimile from the DA's office. Testimony is not recorded. The only other evidence relating to the legislature's passage of SB 607 that Senator Butler could think of are newspaper articles written by reporters covering the senate's activities. Usually, after a legislative session is over, if a bill has become law, the legislative file, containing pertinent documents and minutes of meetings, is not kept. There is no record of floor debate. Senator Butler believes that the legislature has produced everything that it possessed relating to the passage of SB 607.

Senator Butler acknowledged that the Bill's Synopsis and the first Legislative Finding are the only real expressions of legislative intent found on the face of the statute. With regard to section 200.5(4), Senator Butler stated that the thousand-foot restriction was intended to erect a barrier between the adult entertainment establishments and minors who might otherwise observe them. Senator Butler accepted the DA's recommendation that the restriction would, in fact, serve the state's interest in protecting the children, and would be "a sufficient distance for normal function in a community."

When asked if he had given any personal consideration to what would happen to existing businesses that fell within the purview of the statute on its effective date, Senator Butler stated that "the only consideration we gave was that this was the recommendation of the district attorney and we accepted that as what should be done." It satisfied Senator Butler that those businesses would become illegal and be required to move. To Senator Butler, the interests of the families and businesses living and operating near one of the adult clubs outweighed the investments that the club owners had made in opening adult entertainment clubs in their original locations. In response to a question about "grandfathering" or "amortization periods," Senator Butler stated that he had not wanted a grandfather clause or an amortization period in the bill because he wanted the adult establishments to relocate "as soon as possible."

With regard to section 200.11, Senator Butler stated that he had believed that the district attorney's recommendation of the adoption of section 200.11 was necessary to address the problems that the proliferation of nude clubs was causing in the surrounding communities. When asked if he "merely accepted what Tim Morgan the District Attorney said," Senator Butler responded, "No, I'm saying out of frustration we were seeking legal advice from the elected district attorney and we accepted his recommendations as being legally what we should do; it also met what the community wanted the legislature to do, to resolve the problem for them. The legislature "felt like we had a right to regulate a business for the community, to reach an end, to resolve some of these kinds of problems; after seeking advice from the district attorney, that's what we put into the Act."

Senator Butler stated that, concerning the contents of the report of the calls to the Madison County sheriff's office, "we know that they deal with knifings and shootings and

13

prostitution and drug trafficking. Those kinds of reports [are] what the sheriff was having to deal with on a very frequent basis in the rural areas, late at night, with a very short staff." Senator Butler cannot now recall many specific reports. He recalls specific reports related to crack cocaine and knifings. He cannot recall specific reports of prostitution, rape, or other sex-related crimes. Senator Butler averred that he aimed the bill at the problems in the community; he was not attempting to enforce a specific moral or societal belief.

Witness Elizabeth Irene Stanfield testified as follows:

Elizabeth Irene Stanfield is a "telecommunicator," employed by the Madison County Sheriff's Department. She has held the position since 1992. From her workstation in the E-911 facility, she answers all the incoming 911 emergency telephone calls and then ensures that a dispatcher sends the appropriate public service department to the location of the emergency.

Stanfield compiled the group of documents marked as Defendants' Exhibits A-1 through A-10. On top of each exhibit are hand-written pages; underneath the handwritten pages are computer print-outs. The hand-written pages are a summary of the particular emergency activities, involving a response by the Madison County Sheriff's Department, that were reported to have occurred at several nude, semi-nude, and non-nude adult entertainment clubs on the three major roads outside the city limits of Huntsville, Alabama. Stanfield obtained the information contained in the print-outs from a computer database that stores incoming calls and information related to emergency events for nine months after the occurrence. After nine months, the information is transferred to an "archive file," a database that, again, stores the information for a certain period of time. After a certain period of time, which Stanfield cannot remember specifically, the information is irretrievable. As an example of the type of information contained in the reports, Stanfield was asked to read the hand-written summaries of emergency calls from a club called "Dawn's Den." Stanfield read that 911 calls from Dawn's Den involved a lookout for a drunk driver, a fight, an assault, a trespasser with a gun, and an intoxicated patron with a gun.

Stanfield was asked to compile the same sorts of information with regard to several adult entertainment clubs– some nude, some non-nude– during a six-month period, from August 8, 1997 to February 12, 1998. She compiled the information using the date of the emergency call and the address to which law enforcement officials were dispatched. The handwritten summary lists the name of the establishment, the address, the date range for the statistics, and the "event" number and type, which indicates the specific emergency to which law enforcement responded. After Stanfield compiled the information and summarized it, she submitted it to her superior, Captain Curlee.

The parties stipulated that "the printed pages behind Stanfield's handwritten summaries are the actual computer print-outs that record various information to include the dispatching and communications and activities of the law enforcement officials in responding to those dispatches. . . ." The parties stipulated, as well, to their admissibility.

With regard to the nudity status of the clubs in the study, "Ruby's Lounge" did not offer nude dancing; "Visions" offered topless dancing; "Jimmy's Lounge" offered nude entertainment; "Katz" offered nude entertainment; "Centerfold" did not display nudity or semi-nudity; "Cat Daddy's" featured nudity/toplessness; "Pink Diamond" featured nudity/toplessness; "Dream

14

Girls" offered nude entertainment; "Dawn's Den" featured nude dancing; "The Shack," also known as "The Chicken Shack," did not.  Stanfield could not recall whether "Exotic Rhythms" offered nude entertainment.

When asked to compare the number of emergency incidents related to the nude/topless dancing clubs with the number of emergency incidents related to the non-nude clubs, Stanfield testified that "There [were] more calls to the topless establishments than to the non-establishments for the most, in compiling these I found that the numbers were higher for the topless establishments."  She conveyed this information to her superior and, later, to Bill Clifford, the Alabama Assistant State Attorney General.

With regard to Senator Butler's request for a "study," Stanfield explained that, actually, her supervisor, Captain Curlee, instructed her to compile the information.  She denied having any knowledge, prior to performing the study, that state legislators wanted to outlaw nudity in business establishments.  She claimed that she has never spoken with Senator Butler.

Specifically, Curlee instructed Stanfield to research only the adult entertainment clubs that were located on the 3 major highways outside of incorporated Huntsville: Highways 53, 72, and 231/431.  Therefore, Stanfield did not perform a full comparison study of emergency assistance calls to all clubs, both nude and non-nude, in Madison County, including incorporated Huntsville.  Stanfield could have examined incident reports related to all clubs in unincorporated Madison County through the Madison County Sheriff's Department database, and could have worked with the Huntsville municipal police department in order to examine the emergency incidents in adult clubs inside the city limits.  However, she was not instructed to do so.

Stanfield, further, could not recall whether most of the clubs that she examined served alcohol.  She admits that it is possible that a person could consume alcohol off the premises of the clubs and then enter the clubs.

On April 27, 2001, Stanfield signed and notarized an affidavit.  On that day, she had a personal interview with Mr. Clifford, who took notes and prepared the affidavit from the notes in an office in the Madison County 911 center.  Clifford prepared and typed the affidavit himself.  Then she and Clifford drove to a bank, where she signed the affidavit in front of a notary.

Stanfield claimed that she told Clifford that "we had more calls coming in from [nude dancing establishments than non-nude dancing establishments]."  Her opinion was based upon the study that she had conducted of only the clubs on the three major highways in unincorporated Madison County.

Plaintiff's counsel examined the number of emergency calls coming from establishments that offered nude dancing, and compared them to the number of emergency calls coming from non-nude dancing clubs.  Stanfield agreed that some of the emergency situations, like a car running off the highway in front of Cat Daddy's club and crashing into a car in the parking lot, was not necessarily related to the nude activity in Cat Daddy's club.  Stanfield admitted that some of the emergency calls to the nude dancing clubs were not necessarily unique or directly related to the nudity of the dancers.  Stanfield refused to admit, however, that a relationship between the emergency call to the nudity of the dancing was impossible.

After a brief review of the incident reports from August 8, 1997 to February 12, 1998, Stanfield could not find a report of a vice-related or sex-related offense.  She explained that the lack of "vice" calls– prostitution, drugs, etc., attributable to the clubs examined in the study did

15

not mean that the vice crimes did not occur and were not recorded elsewhere. According to Stanfield, " . . . [O]ur vice and narcotic officers are out second shift, there is a lot of reports and activities that they would have on things that they patrolled and maybe wouldn't call into us, that we would have no knowledge of." The vice and narcotic officers are a separate law enforcement division whose activities would be unknown to the 911 emergency department unless the 911 department dispatched the vice/narcotics officers specifically. She indicated, too, that some of the "event" descriptions in the computer print-outs were vague. Calls that she highlighted were "a trespasser that had been asked to leave that didn't leave because he was trying to touch . . . one of the girls there" in a topless establishment. However, trespassers refusing to leave because they wanted to touch the dancers was a complaint both in the nude dancing clubs and the non-nude dancing clubs.

Plaintiff's counsel's next series of questions relating to Stanfield's affidavit concerned the affidavit's assessment of the comparison of the numbers of emergency calls to nude clubs with the emergency calls to non-nude clubs. In her affidavit, Stanfield discussed, separately, the reports of the emergency incidents related to each club. Included in the discussions of every nude dancing club, Stanfield's affidavit states: "This report reflects an approximate five-fold increase in possible criminal events and criminal activities over a drinking establishment that does not offer topless or nude entertainment." In the deposition, plaintiff's counsel asked Stanfield to specifically count the number of reported emergency incidents in each nude dancing club and then compare those numbers with the number of reported emergency incidents in the non-nude dancing establishments. In no case was the increase in the number of emergencies "five-fold" over the non-nude dancing establishments. The increase with regard to all clubs but one was not even two-fold.[7] Stanfield could not explain the disparity of her assessment of the increase in the affidavit with the actual increase, if any, except to say, "maybe I misunderstood the question there, I don't believe that would be what I intended to say, let me put it that way." Stanfield explained that she may have intended to say that there was a "five-percent" increase instead of a "five-fold" increase, but she was unsure.[8] She acknowledged that law enforcement spends "a great deal of time" policing "traditional" bars and non-nude dancing clubs. She held to her conclusion, however, that there is a definite increase in emergency incidents requiring the aid of law enforcement in establishments that offer nude dancing, when compared with establishments that do not.

The following is an enumeration of the number of emergency 911 calls to each adult club, found at defendants' exhibits A-1 through A-10, and a sketch of the kinds of incidents to which law enforcement responded. An asterisk (*) indicates a club offering nude/topless dancing.

_____

[7] The highest number of police dispatches in response to 911 calls to the clubs in the study, 23 calls, came from Dawn's Den, which offers nude dancing. The least number of calls in the study, 10 calls, came from Ruby's Lounge, which does not offer nude dancing. The number of calls from all other clubs, including The Shack and Centerfold, neither of which offered nude entertainment, were greater than 10, but fewer than 23.

[8] Insofar as any inconsistencies, the issue isn't so much what Stanfield says, per se, but what Senator Butler understood and passed on to the legislature.

16

A-1 Dawn's Den*: 23.  Includes several fights, 3 gun incidents, and a knife incident.

A-2 Ruby's Lounge: 10.  Includes a couple of fights, a theft, and gunshots.

A-3 Dream Girls*: 12.  Includes 2 burglaries and 2 fights.

A-4 The Shack: 18.  Includes several thefts, a gun incident, and a fight.

A-5 Visions*: 19.  Includes 2 harassments, unruly guests refusing to leave, 2 fights, and a knife
                incident.

A-6 Jimmy's Lounge*: 14.  Includes 3 fights, 2 car wrecks, 2 thefts.

A-7 Katz*:12.  Includes 1 crack cocaine sale, and 2 unwanted guests refusing to leave.

A-8 Centerfold: 12.  Includes complaints of loud music and 1 car theft.

A-9 Exotic Rhythms/Discount Daddy's (same club)(nudity status unclear): 19.  Includes 2
                shootings, 3 fights, counterfeit currency, and 1 theft.

A-10 Cat Daddy's/Pink Diamond*: 15.  Appears to include mostly the activation of car alarms.

## CONCLUSIONS OF LAW[9]

### The statutes in question

The statutes in question, in pertinent part, read as follows:

"§ 200.11.  It shall be unlawful for any business establishment or any private club to show or allow to be shown for entertainment purposes the human male or female genitals, public area, or buttocks with less than a fully opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state.  A violation of this section shall be a class C felony."

"§200.5(4).  It shall be unlawful for any person to operate an adult bookstore, adult movie house, adult video store, or other form of adult-only enterprise[10] within 1,000 feet of a church, place of worship, church bookstore, public park, public housing project, daycare center, public or private school, college, recreation center, skating rink, video arcade, public swimming pool, private residence, or any other place frequented by minors.  Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than [$10,000] and may be imprisoned in the county jail for not more than one year."

The plaintiff and the circuit court have placed significance upon the legislative statement

---

[9]  For other discussion of the law, this court refers to its earlier opinion at 22 F. Supp. 2d 1296 (N.D. Ala. 1998).

[10]  The defendants have suggested that this reference to "adult-only enterprise" appears to be a scrivener's error and should read "adult-only entertainment."

preceding the 1998 amendments, specifically, § 1, which reads as follows:

> "That in order to protect children from exposure to obscenity, prevent assaults on the sensibilities of unwilling adults by the purveyor of obscene material, and suppress the proliferation of "adult only video stores," "adult bookstores," "adult movie houses," and "adult-only entertainment," the sale and dissemination of obscene material should be regulated without impinging on the First Amendment rights of free speech by erecting barriers to the open display of erotic and lascivious material."

In its opinion, the Eleventh Circuit suggested that this legislative statement arguably

supports the plaintiff's argument that the Alabama legislature had intended, through this statute,

to regulate totally nude entertainment because of "the proscribed message and the perceived effect

of that message on the listeners." Ranch House, 238 F.3d at 1281-1282. The court also stated

that "[i]ndeed, the inclusion of § 200.11 as a separate provision in the same bill as § 200.5(4)

arguably suggests that the Legislature intended § 200.11 to accomplish something more than

preventing secondary effects associated with nude dancing."[11] Id.

In order to properly interpret statutory language, the language must be examined, not by

itself in a vacuum, but in the context of the statute as a whole. United States v. Grigsby, 111 F.3d

806, 829 (11th Cir. 1997); City of Jamestown, Tennessee v. James Cable Partners, L.P., 27 F.3d

534, 537 (11th Cir. 1994)("In determining what constitutes applicable law within the meaning of

§ 365(c)(1), § 365(c)(1) should not be read in a vacuum. Rather, we must read it together with

the other subsections in § 365."); U.S. v. Alexander, 602 F.2d 1228, 1231 (5th Cir. 1979)("Were

this language read in a vacuum, it might support the Government's interpretation. Such is not,

however, a proper method of statutory construction. Bearing in mind that a particular clause or

phrase of a statute cannot be read in isolation but must be construed as part of a statutory whole, .

---

[11] Interestingly, the plaintiff has argued that § 200.11 and § 200.5(4) should be considered in pari materia.

. . we are convinced that when considered in the context of the rest of Section 5(a), the statute gives the Secretary the authority to issue rules and regulations . . . .").

The two sections at issue, as well as the quoted legislative finding, are part of a larger statutory scheme called the "Alabama Anti-Obscenity Enforcement Act," located at Ala. Code §13 A-12-200.1, *et. seq.* The Anti-Obscenity Enforcement Act is, itself, part of Title 13A of the Alabama Criminal Code, found under Chapter 12, "Offenses against Public Health and Morals," within Article 4, "Obscenity and Related Offenses." Section 200.11 was added as an entirely separate section, while subsection (4) of § 200.5 was added as an amendment to § 200.5, an already-existing section. These were not the only sections to be added or changed by the 1998 Amendments. The Alabama legislature also added, among other things, new definitions, such as "Adult Bookstores" and "Adult Movie House" and new employment restrictions that prohibit the hiring of minors in certain establishments. The framework of Alabama's criminalization of obscenity existed prior to the inclusion of these provisions.

The Alabama Anti-Obscenity Enforcement Act, before the most recent amendments, restricted the public dissemination of obscene materials. From 1989 to 1998, the prohibition against the distribution of obscene materials read, in pertinent part: "It shall be unlawful for any person to knowingly disseminate publicly any obscene material." Ala. Code § 13A-12-200.3 (West 1989). The former statute also prohibited the dissemination of obscene material for pecuniary value. Ala. Code § 13A-12-200.2 (West 1989). The current § 200.3 reads, in pertinent part: "It shall be unlawful for any person to knowingly procure or write advertisement for obscene material or disseminate publicly any obscene material ." Ala. Code § 13A-12-200.3. It, too, prohibits the dissemination of obscene material for pecuniary value. § 13A-12-200.2. The statute

19

also provides for certain restrictions on the open display of <u>protected erotic material</u> in establishments frequented by minors, in order to protect minors from perusing it at their leisure, including requiring the use of opaque wrappings and blinder racks. § 200.5(2). Erecting these barriers to the open display of otherwise protected expression in the interest of protecting minors was upheld by the Eleventh Circuit in <u>American Booksellers v. Webb</u>, 919 F.2d 1493, 1508-1509 (11th Cir. 1990)("Blinder racks do not impose a 'substantially overbroad' regulation on 'conduct plus speech.' Adults may peruse and purchase the material without restriction. Under either the balancing test for regulations on material protected to one group but not another, or the test for the constitutionality of a time, place, and manner regulation the burden on adults' access to material protected as to them is constitutionally insignificant and therefore permissible.") (internal citations omitted). Blinder racks arguably are a "restriction" on non-obscene erotic material. Therefore, even the quoted legislative statement's express interest in protecting minors by erecting barriers to the open display of non-obscene erotic and lascivious material that may otherwise have First Amendment protection has some Eleventh Circuit support.

According to the Eleventh Circuit in <u>Penthouse International, Ltd. v. McAuliffe</u>, 702 F.2d 925, 928 (11th Cir. 1983), " . . . .obscenity is not protected under the first amendment. Thus, states . . . are free to enact statutes making the exhibition of obscene matter criminal." (citing <u>Miller v. California</u>, 413 U.S. 15, 23, 93 S. Ct. 2607, 2614 (1973))(internal citation omitted). The Alabama legislature had, even before the 1998 amendments, through the Alabama Anti-Obscenity Enforcement Act, criminalized the public exhibition as well as the distribution of obscene material. Because obscenity has not yet been classified as "protected expression" by the Supreme Court, statutes specifically targeting obscene material either for restriction or for

20

outright prohibition, based upon its "constitutionally proscribable content," do not categorically run afoul of the First Amendment. R.A.V. v. City of St. Paul, 505 U.S. 377, 383-384, 112 S. Ct. 2538, 2543-2544 (1992). Current First Amendment law allows states to target, for regulation, restriction, and criminalization, the distribution and/or sale of obscene materials in unabashedly "content-based" statutory form. Further, the Supreme Court recognized that a regulation is not necessarily content-based simply because on its face it distinguishes among types of speech based on their content. See Renton, 475 U.S. at 46-48. In light of the foregoing observations, this court finds it difficult to understand how a statute's express intent to address the proliferation of obscenity, and its creation of some statutory sections to accomplish that goal, could somehow indicate the existence of an underlying "illicit legislative motive" as to all the included sections. See International Food & Beverage Syss. v. City of Fort Lauderdale, 794 F.2d 1520, 1525 (11th Cir. 1986). The language may not have any bearing on this case, but it probably should not be considered a negative factor, particularly in view of the fact that there is no reasonable inference that the sponsor of the legislation had any purpose other than addressing secondary effects.[12]

**Section 200.11 and Restrictions on Free Speech: A Theoretical, Non-applied Analysis**

The court of appeals has apparently foreclosed the following analysis, but this court will at least address it. The appellate court seems to assume that if there is any requirement in the statute that any slight portion of the dancer's anatomy be covered, it unreasonably diminishes the expressive content of nude dancing. The plaintiff, however, argues that the "message" of nude

---

[12] One could probably reasonably argue that while not all nude dancing is obscene, some types of nude dancing may well be obscene. In its note 3, and in other places, the appellate court refers to "non-obscene nude dancing." 238 F.3d at 1278 n. 3. Apparently, it is indeed possible for some nude dancing to qualify as "obscene."

dancing is "eroticism." Apparently it is the "message" which is protected. This court cannot find that the <u>erotic message</u> is unreasonably diminished by the slight cover required by the statute, particularly in view of the fact that the dancers can verbally enhance their message. In <u>Barnes</u>, Justice Souter observed, "the limitation is minor when measured against the dancer's remaining capacity and opportunity to express the erotic message." <u>Barnes</u>, 501 U.S. at 586. The Supreme Court has referred to "'content-neutral' time, place and manner regulations [which] are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." <u>Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41, 47 (1986). It should be noted that the reference is to "manner" as well as time and place. <u>See also</u>, <u>Pap's</u>, 529 U.S. at 292, 120 S. Ct. at 1392-1393 ("[T]he ban on public nudity here is no different from the ban on burning draft registration cards in <u>O'Brien</u>, where the Government sought to prevent the means of expression and not the expression sentiment itself."). Also compare the regulations at issue in the instant case with the blinder rack discussion in <u>American Booksellers</u>, 919 F.2d at 1508-1509, *supra*.

There are repeated suggestions in the Eleventh Circuit and Supreme Court cases that the protected <u>expression</u>, or <u>message</u>, must be restricted. <u>Barnes</u> recognized the need to allow "<u>some</u>" nudity. 501 U.S. at 565 n. 1. Furthermore, the Supreme Court clearly stated, in both <u>Barnes</u> and <u>Pap's</u>, that a minimal requirement of pasties and a G-string did not unduly restrict the dancers' erotic expression. <u>Barnes</u>, 501 U.S. at 572, 111 S. Ct. at 2463; <u>Pap's</u>, 529 U.S. at 301, 120 S. Ct. at 1398. If a statute's "restriction" or "burden" on a certain "message" is the trigger of First Amendment concerns, and Supreme Court precedent clearly has stated in prior cases that regulations similar to, and *even more restrictive than*, the one at issue here, are but "de minimis"

22

regulations on the medium of the expression that do not diminish its message, this court queries

the necessity of further analysis.  Nevertheless, this court apparently has not been given leeway to

attach any weight to such a conclusion.  If it could be determined that there is no real content-

based regulation of the "message," § 200.11 would withstand even strict scrutiny, unless such a

conclusion has been foreclosed by the appellate court.  While the appellate court has appeared to

foreclose this analysis, it did frame the "defining" issue for this court's consideration as "whether

§ 200.11 is a content based regulation of protected expression."  (emphasis added).  Further, the

appellate court stated, "The Supreme Court recently reiterated that the hallmark of a content-

based regulation is the government's purpose to suppress the message. . . . See Hill v. Colorado,

530 U.S. 703, 120 S. Ct. 2480, 2491 . . . ." 238 F.3d at 1278 (emphasis added)."   While this

court feels that § 200.11 arguably could be found to be constitutional based on conclusions that

the protection of the expression itself is "limited," that the "message" of eroticism has been found,

in prior Supreme Court precedent, not to have been suppressed by similar regulations and by

more "restrictive" regulations, and that the O'Brien elements are satisfied, this court also feels

that the law of the case dictates otherwise.[13]  To be perfectly clear, this court does not decide this

case on the immediately preceding grounds.

## Section 200.11: Negative Secondary Effects

The doctrine of negative secondary effects operates as an exception to the general rule

that statutes that discriminate among particular kinds of speech or expression on the basis of

---

[13] A legitimate question may be whether we tend to view any statute that addresses
expression, even tangentially, as "suppression."  However, if the message has not been
suppressed, wherein lies the First Amendment violation?  Pap's stands for the proposition that
coverings such as are required by § 200.11 leave "ample capacity to convey the dancer's erotic
message."  529 U.S. at 301.  Perhaps we cannot see the principle for the propositions.

content are inherently suspect and are to be subjected to the strictest scrutiny.  Ranch House, 238
F.3d at 1279-1280.  The Supreme Court "consistently has held that combating the harmful
secondary effects of adult businesses, such as increased 'crime and other public health and safety
problems' is a substantial interest."  Ward v. County of Orange, 217 F.3d 1350, 1353 (11th Cir.
2000)(citing City of Erie v. Pap's A.M., 529 U.S. 277, 120 S. Ct. 1397 (2000)).  Unlike
regulations that prohibit certain forms of expression based upon either disagreement with the
content or the effect of the expression upon the audience, a regulation aimed at the negative
secondary effects associated with adult entertainment establishments is considered to be unrelated
to the suppression of its erotic message.  Flanigan's Enterprises, Inc. v. Fulton County, Georgia,
242 F.3d 976, 983-984 (11th Cir. 2001).  According to the Eleventh Circuit, "[i]f the
governmental purpose in enacting the regulation is unrelated to the suppression of expression,
then the regulation need only satisfy intermediate scrutiny under O'Brien.  If the government
interest is related to the content of the expression, however, then the regulation falls outside the
scope of the O'Brien test and must be subjected to strict scrutiny."  Id.

        According to the Eleventh Circuit, this court is to examine the evidence in this case to
determine whether the Alabama legislature passed the statute placing limits on nude dancing
because it disagreed with the message of the expression or because it desired to combat negative
secondary effects of nude dancing establishments on the safety, health, and welfare of the
surrounding community.  Id. at 1281.  As earlier indicated in its instructions to this court
regarding the application of the negative secondary effects doctrine, the circuit court stated that
this court may consider "a wide variety of materials, including the text of the statute, any
preamble or express legislative findings associated with it, legislative history, and studies and

24

information of which legislators were clearly aware." Id. at 1280 (citing Colacurcio v. City of

Kent, 163 F.3d 545, 552 (9th Cir. 1998). Regardless of plaintiff's arguments as to Alabama law

relating to legislative intent, this court is bound by the law of this case as enunciated by the

Eleventh Circuit. This court is also otherwise persuaded that federal law controls.

The Eleventh Circuit further stated, in Ranch House, that, in order to avail themselves of

the negative secondary effects doctrine, the defendants must prove that the legislature actually

considered negative secondary effects and actually "aimed" the statute's prohibitive power at

these negative effects.[14] Id. at 1283. Examples of some negative secondary effects of adult

entertainment that have been cited are: "impacts and threatens to impact on the public health,

_____

[14] According to the Eleventh Circuit, "[w]e are aware of no case where a court has adopted [the argument that the court should simply assume that the legislative intent was to combat negative secondary effects] or sustained a secondary effects argument in the absence of *any* indication that the relevant legislative body intended to ameliorate such effects." Ranch House, 238 F.3d at 1282. Actually, in Café 207, Inc. v. St. Johns County, 856 F. Supp. 641, 645 (M.D. Fla 1994), the district court stated that "secondary effects of proscribed conduct may be taken into consideration by a court in evaluating the governmental interests justifying impingement upon free speech rights even when, as in *Barnes*, there is no legislative history demonstrating that the lawmakers actually considered secondary effects or any other specific factor (such as protecting order and morality) in enacting the challenged law." (emphasis added). The Café 207 opinion was affirmed by the Eleventh Circuit "for the reasons stated in its dispositive memorandum opinion," Café 207, Inc. v. St. Johns County, 66 F.3d 272, 273 (11th Cir. 1995), and subsequently was quoted for the above proposition by the Eleventh Circuit in Sammy's of Mobile, Ltd. v. City of Mobile, 140 F.3d 993, 997 n. 6 (11th Cir. 1998). Additionally, the district court in Café 207 based its holding upon the Supreme Court's treatment of the statute in Barnes. 856 F. Supp. at 645. The Barnes statute and the Florida statute in Café 207, however, were broad anti-nudity ordinances that generally prohibited public nudity across the board. Barnes, 501 U.S. at 563-564, 111 S. Ct. at 2459; Café 207, 856 F. Supp. at 643. The Supreme Court in Barnes described the general public nudity ordinance as being "of ancient origin," and explained that "the statute's purpose of protecting societal order and morality is clear from its text and history." 501 U.S. at 567-568, 111 S. Ct. at 2461. Furthermore, the Barnes Court found that the public nudity statute was, within the specific context of Indiana law, historically aimed at protecting public health, safety, and morals. Id. at 569; S. Ct. at 2462. In light of its "ancient origins," its historic presence in Indiana law, and its traditional purpose of furthering societal order and public health, the Supreme Court in Barnes accepted the argument that, although not apparent from the legislative record (or lack thereof), the legislature's intent was to prevent the negative secondary effects of nudity, not to suppress "nudity-as-expression." Id. at 570; 111 S. Ct. at 2462. The same analysis may be applied to the broad, anti-public nudity statute in Café 207. Common sense might dictate that the expressed concerns are even more applicable to a nude dancing establishment than to public nudity in general. It is somewhat a nonsensical irony that a legislature can, without expressing a concern about secondary effects (or anything else), ban all public nudity, but that a legislature which simply fails to parrot secondary effects language cannot ban even the grossest commercialized form of nude presentations. This court again notes that, in Barnes, the Supreme Court upheld the anti-public nudity statute, even though it acknowledged that legislative intent was "impossible to discern" other than from the plain face of the statute.

25

safety and welfare by providing an atmosphere conducive to violence, sexual harassment, public intoxication, prostitution, the spread of sexually transmitted diseases and other deleterious effects." Pap's, 529 U.S. at 290, 120 S. Ct. at 1391-1392; "occurrence of criminal behavior and undesirable community conditions . . . depression of property values, increased crime, and acceleration of community blight." Flanigan's, 242 F.3d at 984. Again, in order to carry this burden across the threshold of sufficient proof, the defendants' showing may, at minimum, consist of "nothing more than proof that the legislature reasonably relied on findings reported elsewhere suggesting a link between the proscribed expression and negative secondary effects." Id. The Supreme Court has specifically held that it is reasonable for a state or local government to, in these instances, rely upon the experience of other jurisdictions. Pap's, 529 U.S. at 297, 120 S. Ct. at 1395. Such "findings reported elsewhere," assuming the factual scenarios are "of the same character," could even be the evidentiary foundations already "set forth in Renton and American Mini Theatres to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood." Pap's, 529 U.S. at 296-297, 120 S. Ct. at 1395. [15]

Furthermore, it is sufficient if the state's predominant, but not total, purpose in passing the statute was combating negative secondary effects. City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-48, 106 S. Ct. 925, 929 (1985)("According to the Court of Appeals, if "a *motivating factor*" in enacting the ordinance was to restrict respondents' exercise of First Amendment rights the ordinance would be invalid, apparently no matter how small a part this motivating factor may have played in the City Council's decision. . . This view of the law was rejected in United States

---

[15] Common sense might also dictate that courts could consider the same information.

26

v. O'Brien, 391 U.S., at 382-386, 88 S. Ct., at 1681-1684 . . . ."); see also Pap's, 529 U.S. at

292, 120 S. Ct. at 1392-1393 ("In light of the . . . determination that one purpose of the ordinance

is to combat harmful secondary effects, the ban on public nudity here is no different from the ban

on burning draft registration cards in *O'Brien*, where the Government sought to prevent the

means of the expression and not the expression sentiment itself."). As long

as the state can prove that the predominant purpose of the regulations was to fight the negative

secondary effects of adult entertainment, the court cannot "strike down otherwise constitutional

legislation on the basis of a speculated illicit legislative motive." International Food, 794 F.2d at

1525.

The court must, therefore, look to the evidence to determine whether the defendants have

shown that the predominant motive of the Alabama legislature in passing § 200.11 was to combat

the negative secondary effects of totally nude and/or topless adult entertainment establishments.

If the defendants have carried their burden, the statute will be examined under the O'Brien

intermediate scrutiny test that is applied to content-neutral restrictions on expression. If the

defendants fail to carry their burden, the statute should be subjected to strict scrutiny.

The court concludes that the defendants have proved that the predominant motive that led

to the passage of § 200.11 and § 200.5(4) was a concern about the secondary effects of nude

dancing clubs. There is no substantial, or even minimal, evidence that the Alabama Legislature

was motivated by a concern about the message of nude dancing as such. The evidence to the

contrary is substantial. This evidence includes the testimony of Senator Butler and the report

27

created at his request. The court finds his testimony to be credible.[16] It further appears that, in

drafting the bill, the Alabama Legislative Reference Service considered prior statutes and case

law. Note the similarity of language in the statute to other statutes, particularly to that discussed

in Barnes.

This court does not deem it necessary to totally determine the factual accuracy of all of the

information gathered by Butler or presented by Stanfield. The relevant issue is what the

legislative motive was and whether the approach taken was reasonable, not whether it was

perfect. The defendants have obviously made more than a "minimal" showing that the

predominant motive that led to the passage of both of the subject sections was a concern about

increased crime and other secondary effects. Again, there is no evidence to the contrary. The

defendants have met their burden of proof with regard to secondary effects. It has not been

contradicted, undermined or rebutted.

This conclusion is consistent with the instructions of the appellate court and other case

holdings as follows:

The appellate court stated, "[W]e will rely on all 'objective indicators of intent, including

the face of the statute, comparison to prior law, facts surrounding enactment . . . .'" Id. at 1280

(quoting Colacurcio v. City of Kent, 163 F.3d 545, 552 (9th Cir. 1998)). Further, "Our task,

therefore, is to . . . determine whether the Alabama Legislature's purpose . . . was borne of

disagreement with the message . . . or rather a desire to ameliorate the perceived negative effects

of nude dancing venues on the safety, health and welfare of the surrounding community." Id. at

---

[16] As to the consideration of calls to the police, compare, Grand Faloon Tavern, Inc. v.
Wicker, 670 F.2d 943, 950 (11th Cir. 1982).

28

1281 (emphasis added). This court notes that other language in the appellate opinion suggests

that "record of legislative proceedings" is not restricted to written records. Id. at 1280.

The appellate court referred, a number of times, to the minimal level of evidence of

legislative intent which is required. These include:

> "We are aware of no case where a court has . . . sustained a secondary
> effects argument in the absence of any indication that the relevant legislative body
> intended to ameliorate such effects (emphasis in original) " Id. at 1282-1283.

> "We do not conceive of this burden as a rigorous one. Nevertheless, state
> actions . . . must cite to some meaningful indication in the language of the code or
> in the record of legislative proceedings . . . . (emphasis in original). Id. at 1283.

"Imposing this minimal burden . . . ." Id. at 1283.

> "[C]ourts still have insisted on some kind of a minimal evidentiary showing, even if
> that showing consists of nothing more than proof that the legislature reasonably
> relied on findings reported elsewhere . . . ." (emphasis added). Id.

The Supreme Court's opinion in Pap's stated that the City of Erie could, and did,

"reasonably rely on the evidentiary foundation set forth in Renton and American Mini Theatres

that secondary effects are caused by the presence of even one adult entertainment establishment in

a given neighborhood." 120 S. Ct. at 1395. Sammy's stands for the proposition that legislatures

or councils can rely on "the experience of other cities, case law reciting findings on the issue, as

well as [the officials'] own wisdom and common sense." 140 F.3d at 997 (emphasis added).

Finally, "The First Amendment does not require a city, before enacting such an ordinance, to

conduct new studies or produce evidence independent of that already generated by other cities, so

long as whatever evidence that the city relies upon is reasonably believed to be relevant to the

problem that the city addresses." Renton 475 U.S. at 51.

29

**Section 200.11 and Intermediate Scrutiny[17]**

The Eleventh Circuit has also instructed this court apply the O'Brien intermediate scrutiny test to § 200.11, to determine whether, regardless of the availability of the negative secondary effects doctrine, the statute is still unconstitutional. Ranch House, 238 F.3d at 1285. The intermediate scrutiny test requires a court to determine whether: (1) the government regulation is "within the constitutional power of the government to enact;" (2) the regulation furthers "an important or substantial government interest;" (3) the interest served is "unrelated to the suppression of free expression;" and (4) any incidental restriction on First Amendment freedoms "is no greater than is essential to the furtherance of the governmental interest." Pap's, 529 U.S. at 296, 301, 120 S. Ct. at 1395, 1397. Enacting anti-nudity ordinances is within the Alabama legislature's "police powers." Id. at 296, 120 S. Ct. at 1395; Barnes, 501 U.S. at 569, 111 S. Ct. at 2462. Since the defendants have adequately proven that, through § 200.11, the Alabama legislature actually intended to ameliorate negative secondary effects of nude dancing, the second O'Brien test is satisfied. Preserving public health, safety, welfare, and morals has consistently been labeled "a substantial government interest." Barnes, 501 U.S. at 569, 111 S. Ct. at 2462; Sammy's, 140 F.3d at 996-997. Furthermore, with regard to whether the prohibition against total nudity actually addresses the governmental interest, the Supreme Court has held that a city or state need not make its own particularized findings of the connection between nude dancing and negative secondary effects within its own borders, but may, instead, rely upon the findings in prior Supreme Court cases that "such nude dancing was likely to produce the same secondary effects."

_____

[17] For further discussion and citation of cases on this issue, see this court's earlier opinion at 22 F. Supp. 2d 1296.

Pap's, 529 U.S. 277, 296-297; 120 S. Ct. 1395. Therefore, the prohibition of nudity in § 200.11, since it was aimed at the negative secondary effects of totally nude "entertainment," furthers the government's substantial interest in addressing these secondary effects. Since the doctrine of negative secondary effects has caused this statute to be designated a content-neutral regulation, it is unrelated to the suppression of free expression. Id. at 301; 120 S. Ct. at 1397.

The fourth O'Brien test examines whether the regulation prohibits no more speech than is essential to further the government's interest. The plaintiff argues that the statute's qualification of nudity "for entertainment purposes" covers, not only erotic nude dancing, but also nudity that is incidental to more serious works of art and literature; for example, the musical Hair, in which nudity is part of the "artistic" theme. The circuit court also noted that it was "at least arguable" that the language of § 200.11 might also reach nude paintings in a commercial art gallery. Id. at 1286 n. 7. As the court noted, while § 200.11 prohibits "business establishments'" and "private clubs" from showing nudity "for entertainment purposes," it defines neither "business establishment" nor "entertainment purposes." Assuming, *arguendo*, that a non-adult-only commercial theater or art gallery could be considered a "business establishment," and that the nude artistic expression performed or displayed is intended, in part, to "entertain" viewers, serious works of art and theater that contain nudity could fall within the purview of § 200.11.[18] These concerns, however, are better stated as grounds for an "overbreadth" challenge, which this court

---

[18] The Eleventh Circuit noted that, at oral argument, counsel for the defendants had suggested that § 200.11 applied only to live entertainment, but the court found that no such limitation appeared on the face of the statute. Ranch House, 238 F.3d at 1285 n. 7. In view of the de minimis restriction, it could be reasonably argued that there is, really, no restriction on any sort of presentation involving nudity; particularly live public nudity. This Court, however, does not reach this issue.

31

will address, *infra*.

In Barnes, the reach of the broad anti-public nudity statute had been vaguely qualified by the Indiana Supreme Court, which acknowledged the need to "allow some nudity as a part of some larger form of expression meriting protection, when the communication of ideas is involved." 501 U.S. at 565 n. 1, 111 S. Ct. at 2460 n. 1. The Court nevertheless found that "the Indiana Supreme Court did not affirmatively limit the reach of the statute . . . but merely said that to the extent the First Amendment would require it, the statute might be unconstitutional as applied to some activities. Id. Later in the opinion, the Supreme Court interpreted the Indiana Supreme Court's construction of the statute as "preclud[ing] nudity in what are essentially places of public accommodation such as the Glen Theatre and the Kitty Kat Lounge." Id. at 566, 111 S. Ct. at 2460. It finally concluded that the statute did not violate the First Amendment. Id. at 565, 111 S. Ct. at 2460. The Court did not, however, determine whether the statute was facially overbroad, even though the issue arose both at the district court and the circuit court.[19] Id. at 564-565, 111 S. Ct. at 2459.

Side-stepping the overbreadth issue, the Barnes Court found that the statute at least

_____

[19] The district court originally had invalidated the statute for facial overbreadth, but the Seventh Circuit had reversed the holding, claiming that the Supreme Court had already found an overbreadth challenge to the public nudity ordinance to be without substance when it had summarily dismissed, for want of a substantial federal question, a case that had presented the same overbreadth challenge. Glen Theatre, Inc. v. Pearson, 802 F.2d 287, 289 (7th Cir. 1986)(citing Clark v. Indiana, 446 U.S. 931; 100 S. Ct. 2146 (1980)). The Seventh Circuit then remanded the case to the district court, instructing it to consider the plaintiff's "as applied" challenge. Pearson, 802 F.2d at 290-291. The district court, and, eventually, the Seventh Circuit, held that the Indiana statute unconstitutionally restricted expressive activity because its purpose was to suppress the erotic message. Barnes, 501 U.S. at 565, 111 S. Ct. at 2460. Although the Supreme Court noted that the Seventh Circuit had concluded that the overbreadth challenge to the Indiana statute had been deemed insubstantial in the earlier case, it did not clarify whether it truly had disposed of the overbreadth issue. However, it also did not address the issue, even though it noted that the statute proscribed public nudity "across the board," and suggested that the Indiana Supreme Court had not "affirmatively" limited the statute's application. Barnes, 501 U.S. at 565 n.1 -566, 111 S. Ct. at 2460-2460 n.1.

32

applied to the kind of nudity found in adult-only establishments. 501 U.S. at 572, 111 S. Ct. at 2463. The Court upheld the statute under the O'Brien test, stating that "[i]t is without cavil that the public indecency statute is "narrowly tailored"; Indiana's requirement that the dancers wear at least pasties and G-strings is modest, and the bare minimum necessary to achieve the State's purpose." Id. In both Barnes and Pap's, the Supreme Court, applying the fourth O'Brien test, found that requiring nude dancers in adult-only entertainment establishments to wear pasties and a G-string had only a *de minimis* effect on the erotic message of the dance and, therefore, did not prohibit too much expression. Barnes, 501 U.S. at 572, 111 S. Ct. at 2463; Pap's, 529 U.S. at 301, 120 S. Ct. at 1398.

In Pap's, the challenged city ordinance prohibited individuals from not only exposing specific parts of their anatomy in public places, but also wearing costumes that gave the appearance that the wearer was exposing those parts. 529 U.S. at 285, 120 S. Ct. at 1389. The statute defined "public place" to include a "theater," a term which could include both adult-only theaters and ordinary theaters where serious works of literature are performed. Id. at 285, 120 S. Ct. at 1388. However, the Court examined the constitutionality of the statute only "as applied" to the plaintiffs, noting that the Pennsylvania Supreme Court had not addressed the claim that the ordinance was unconstitutionally overbroad. Id. at 286, 120 S. Ct. at 1389. The Pap's Court, like the Barnes Court, held that the ordinance passed the fourth O'Brien test because the restriction on expression was not greater than was essential to further the governmental interest. 529 U.S. at 301, 120 S. Ct. at 1397. The Court again found that the requirement of pasties and a

33

G-string "leaves ample capacity to convey the dancer's erotic message."[20] Id.

Since the Alabama statute requires a "fully opaque covering" on portions of body parts prohibited from being exposed publicly, it can be likened to the "pasties and a G-string" requirement in Barnes. It certainly is not as stringent as the ordinance upheld in Pap's, which goes so far as to prohibit coverings, regardless of their transparency, that *resemble* the enumerated body parts. See Pap's, 529 U.S. at 284, 120 S. Ct. at 1388. As applied to the plaintiff in the instant case, based on the holdings in Barnes and Pap's, § 200.11 restricts no more of the plaintiff's expression than is essential to accomplish the government's substantial interest in protecting public order and morality by combating the negative secondary effects of nude entertainment.

It seems obvious that the plaintiff has not pursued an as applied challenge to § 200.11 because such a challenge would be fruitless. That, however, does not necessarily restrict the court's analysis of the O'Brien issue or of the overbreadth issue.

**Section 200.11 and Substantial Overbreadth**

In some of the instances in which the Supreme Court has upheld statutes that broadly prohibit public nudity, the statutes considered contained exceptions or exemptions for serious works of art and literature, or, so far, had only been interpreted by the supreme courts of their respective states to apply to nudity in adult-only entertainment establishments. In Café 207, the public nudity statute that was upheld by the district court contained an express exemption that excluded nudity that "constitutes a part of bona fide live communication, demonstration or

_____

[20] Again, this holding raises the question as to whether such requirements even infringe on the message so as to invoke First Amendment review.

34

performance by a Person wherein such nudity is expressive conduct incidental to and necessary for the conveyance or communication of a genuine message or public expression and is not a mere guise or pretense utilized to exploit the conduct of being nude for profit or commercial gain . . . ." 856 F. Supp. 641. The statute in this case does not contain such clauses, and it has not yet been given a limiting construction by the Alabama Supreme Court.

The Eleventh Circuit instructed this court to consider further the plaintiff's argument that § 200.11 is unconstitutionally overbroad because it prohibits too much protected expression. According to the court in Ward v. County of Orange, 217 F.3d 1350, 1355 (11th Cir. 2000), an ordinance is unconstitutionally overbroad "when lawmakers define the scope of a statute to reach both unprotected expression as well as, at least potentially, protected speech." (quoting American Booksellers v. Webb, 919 F.2d 1493, 1502 (11th Cir. 1990)). In order for it to be declared facially invalid, however, the challenger of the statute must show that "it is 'substantially overbroad, that is, its application would be unconstitutional in a substantial proportion of cases." Id. (quoting Agan v. Vaughn, 119 F.3d 1538, 1542 (11th Cir. 1997).

Ordinarily, "a person to whom a statute may be constitutionally applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." Broadrick v. Oklahoma, 413 U.S. 601, 610, 93 S. Ct. 2908, 2915 (1973). This general rule is bent somewhat in the context of First Amendment challenges, when the statute's very existence would threaten parties not before the court who desire to engage in the potentially protected-but-prohibited expression encompassed by the overbreadth, but who might refrain from engaging in that expression rather than facing prosecution for violating the statute or attempting to have it invalidated. Brockett v. Spokane

35

Arcades, Inc., 472 U.S. 491, 503, 105 S. Ct. 2794, 2801-2802 (1985). Even so, the Supreme Court has stated that the facial invalidation of a statute for overbreadth should be used "sparingly and only as a last resort." Broadrick, 413 U.S. at 613, 93 S. Ct. at 2916. Furthermore, there is at least some precedent to the effect that "when First Amendment overbreadth claims have been invoked against ordinary criminal laws that are sought to be applied to protected conduct, the usual remedy is to reverse any criminal conviction flowing from the law as unconstitutionally applied, not to adjudicate that the law itself is facially invalid." Café 207, 856 F. Supp. at 647 (citing Broadrick, 413 U.S. at 615-616, 93 S. Ct. at 2917-2918).

The Eleventh Circuit has explained that "[a]n overbreadth challenge is accordingly disallowed if the measure is readily subject to a limiting construction that would remove the threat of deterrence to constitutionally protected expression." Grand Faloon Tavern, Inc. v. Wicker, 670 F.2d 943, 946 (11th Cir. 1982). The court in Café 207 summarized the substantial overbreadth analysis in cases involving criminal statutes that apply to conduct that the plaintiff claims is expressive: "the excessive scope of the statute or ordinance being reviewed must not only be real but substantial, and not subject to cure through case-by-case analysis and limiting judicial construction or partial invalidation." 856 F. Supp. at 648. Of course, in Café 207, the exemptions in the statute, mentioned, *supra*, provided boundaries sufficient to protect the statute from a successful overbreadth attack. Id. at 648-649. It also contained a severability clause, allowing the remainder of the statute to stand in spite of the occasional invalidation of a word or phrase. Id. The district court stated that "in light of the . . . exemptions and judging the ordinance as a whole under the principles of Broadrick and Geaneas, there is no real and substantial overbreadth in the measure that cannot await case-by-case limiting construction or, if

36

necessary, partial invalidation," and went on to conclude that the plaintiff lacked standing to challenge the statute.  Id.  It did not, however, expressly state that the same result would have been reached had the exemptions or severability clause not been present in the statue.  Id.

Brockett, another possibly pertinent case, involved a challenge to the Washington State moral nuisance law, which established penalties for offenses related to obscenity and prostitution. 471 U.S. at 493, 105 S. Ct. at 2796.  The statute was challenged on the basis of its broad definition of "prurient," which included the word "lust."  Id. at 494, 105 S. Ct. at 2796.  The appellees had argued that the statute was facially overbroad, because the definition of "lust" encompasses non-obscene expression.  Id. at 496, 105 S. Ct. 2797.  Finding that the word "lust" had acquired a very broad definition that included a healthy, wholesome, "good old fashioned" interest in sex, Id. at 499, 105 S. Ct. at 2799, the circuit court invalidated the entire statute.  Id. at 495, 105 S. Ct. at 2797.

The Supreme Court described the facial invalidation of the statute as "improvident."  Id. at 502, 105 S. Ct. at 2801.  In so doing, the Court reiterated the general rules that those to whom a statute may constitutionally be applied do not have standing to challenge the statute on the grounds that it may be unconstitutionally applied to others, and that if a wholly independent part of the statute is invalid while the surrounding provisions are valid, the valid provisions may stand while the invalid provision is rejected.  Id.  The Court stated that these general rules normally are adhered to, "absent 'weighty countervailing' circumstances."  Id. (citing United States v. Raines, 362 U.S. 17, 22 (1960)).  Specifically, the Court found that "the First Amendment involvement in this case [does not] render inapplicable the rule that a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it."  Id.  It went on to

37

provide examples of cases in which it refrained from invalidating the statute on its face in favor of invalidating it only so far as it reached protected conduct. Id. (citing Cantwell v. Connecticut, 310 U.S. 296 (1940)(Court did not facially invalidate the state offense of 'breach of the peace,' but invalidated only to extent applied to prevent peaceful distribution of religious literature on streets); Marsh v. Alabama, 326 U.S. 501 (1946)(Court did not facially invalidate statute, but invalidated only to extent applied to imposition of criminal punishment on those distributing literature on streets of company town); NAACP v. Button, 371 U.S. 415 (1960)(Court did not facially invalidate state's rules against solicitation, but invalidated only to extent applied to activities of NAACP involved in that case)(United States v. Grace, 461 U.S. 171, 175 (1983)(Court refused to facially invalidate federal statute prohibiting demonstrations on Supreme Court grounds, confining holding to invalidate statute as applied to picketing on public sidewalks surrounding building).

 The Brockett Court disagreed with the circuit court's determination that the statute was not amenable to a limited construction. 472 U.S. at 503, 105 S. Ct. at 2801. Specifically, it explained that it was "unconvinced that the identified overbreadth is incurable and would taint all possible applications of the statute . . . ." Id. The Court found that either limiting the definition of "lust" to exclude a normal interest in sex, or excising the word "lust" from the definition of "prurient" adequately would have addressed the constitutional issue in the case. Id. at 505, 105 S. Ct. at 2802. It concluded that, in the absence of countervailing considerations, the "statute should have been invalidated only insofar as the word 'lust' is to be understood as reaching protected materials." Id.

 Under the precedent established by the foregoing cases, this court should first look to the

38

statute to determine whether it is substantially overbroad, that is, whether its application would be unconstitutional in a substantial number of cases. The plaintiff bears the burden of proving that it is substantially overbroad. Before the court should declare that the statute is facially invalid, however, Supreme Court precedent instructs the court to determine whether a limiting construction, or the excising of an offending term or provision, would save the remainder of the statute. If the statute is indeed irreparably substantially overbroad, it "may not be enforced against anyone, including the party before the court, until it is narrowed to reach only unprotected activity, whether by legislative action or by judicial construction or partial invalidation." Id. at 503-504, 105 S. Ct. at 2802.

This court concludes that the statute should be considered as applied to businesses of the kind that is operated by the plaintiff, which was the obvious purpose of the Alabama Legislature, since its concern about the secondary effects of those businesses spawned the 1998 amendments. This court is satisfied that the Alabama Supreme Court would construe the statute(s) so that issues of overbreadth are avoided. There is the further question of whether the plaintiff can even raise the issue as to expressive activities other than its own. This court thus rejects any overbreadth challenge to § 200.11. Further, this court concludes that the plaintiff has not mounted a successful facial challenge to § 200.11. See United States v. Salerno, 481 U.S. 739, 745 107 S. Ct. 2095 (1987)(successful facial challenge must establish that no set of circumstances exists under which the challenged statute would be valid.).

**Section 200.5(4): Amortization and Access[21]**

---

[21] Interestingly, the defendant(s) have apparently suggested that if § 200.11 is held to be constitutional and the plaintiff complies with it, the plaintiff may not be required to relocate under § 200.5(4). This court does not reach that issue.

The Eleventh Circuit directed this court to further consider the plaintiff's argument that §
200.5(4) is unconstitutional because it contains no amortization clause that would operate as a
safe-harbor provision for already-existing adult entertainment establishments until they relocate.
Currently, it is stipulated that the Platinum Club is in violation of § 200.5(4) because it is located
within 1,000 feet of a residence.  Although the authorizing bill delayed this section's effective date
until "the first day of the third month following its passage and approval by the Governor, or its
otherwise becoming law," 1998 Ala. Acts 98-467, § 9, this two-month window passed as the
plaintiff, instead of conforming to the statute, challenged its constitutionality in court.

Zoning ordinances like § 200.5(4) usually are treated, for First Amendment purposes, as
reasonable time, place, and manner regulations that target the social problems associated with
adult entertainment establishments.  <u>Ward</u>, 217 F.3d at 1353; <u>David Vincent, Inc. v. Broward
County</u>, 200 F.3d 1325, 1333 (11th Cir. 2000).  These ordinances pass First Amendment muster if
they are narrowly tailored to further a substantial government interest and if they "allow for
reasonable alternative avenues of communication."  <u>David Vincent</u>, 200 F.3d at 1333; Renton,
475 U.S. at 50, 106 S. Ct. at 930.  The plaintiff in the instant case focuses its initial challenge to §
200.5(4) on what it considers to be a lack of an amortization clause for existing businesses, which,
it argues, until the business(es) are able to relocate, effectively would cut off reasonable
alternative avenues of communication.  Although plaintiff Ranch House framed this challenge as a
facial challenge, the Eleventh Circuit found that it would be better stated as an "as applied"
challenge.  <u>Ranch House</u>, 238 F.3d at 1287.

Ranch House also argues that the statute does not allow it, or other pre-existing adult-
only establishments, an opportunity to continuously offer protected expression to paying

customers, thereby "immediately extinguishing protected speech." Further, the Eleventh Circuit's

opinion also noted that Ranch House appears to argue that the lack of a longer amortization

clause would also "completely deny[] public access to all protected nude entertainment in Calhoun

County during the period necessary for it to relocate." Id. The court suggested that Ranch

House's argument would be bolstered if the Platinum Club were "one of a small number of venues

in [Calhoun] County, and the statute effectively requires at least the temporary closure of

substantially all such venues." Id. The circuit court directed this court to determine whether the

application of the statute, without a longer amortization clause, would require the temporary

closure of substantially all adult-only venues, and to consider the effect of this possibility on the

constitutionality of the statute. Id. Finally, the court also directed this court to consider plaintiff

Ranch House's concern that "the statute does not adequately safeguard existing adult

entertainment businesses against the purposeful future encroachment of 'protected buildings'

(e.g., churches or residences) that would 'knock-out' such businesses." Id. at 1288 n.1.

In David Vincent, the Eleventh Circuit noted that the Constitution does not require a city

ordinance to provide "waiver" or "grandfathering" clauses to already existing, non-conforming

businesses, including adult businesses offering protected expression. 200 F.3d at 1332. A

constitutional requirement that a city waive zoning restrictions that would force an already-

existing adult business to relocate, or to "grandfather" already-existing adult businesses into the

prohibited zone would render the zoning ordinance ineffective to accomplish its purpose of

protecting the zone from the negative secondary effects of adult businesses. The David Vincent

court noted that "Courts have frequently upheld the application of new zoning regulations to

existing adult businesses with an amortization period." Id. at 1332 n. 11. However, as the

41

Eleventh Circuit in <u>Ranch House</u> noted, neither the Supreme Court nor this circuit has ruled on whether or when the First Amendment requires an amortization clause for a zoning regulation that would affect a business that "deals in" protected expression. 238 F.3d at 1286.

Furthermore, in cases in this circuit in which First Amendment challenges to zoning statutes have arisen, the issue before the court has not included the reasonableness of the amortization period, but, instead, the availability of "reasonable alternate avenues of communication" in the form of the availability of "alternate <u>venues</u> for communication." See <u>Renton</u>, 475 U.S. at 53, 105 S. Ct. at 932 (statute challenged on basis of available sites for relocation); <u>David Vincent</u>, 200 F.3d at 1332-1333 (ordinance gave non-conforming businesses 5 years to relocate; statute challenged on basis of number of available reasonable relocation sites); <u>International Food</u>, 794 F.2d at 1525-1526 (ordinance challenged on basis of number of available location sites); <u>Wise Enterps., Inc. v. Unified Gov't</u>, 217 F.3d 1360, 1365 (11th Cir. 2000)(ordinance requiring operator of nude barroom dancing establishment either to move from Central Business District or cease nude dancing generally upheld in light of available reasonable avenues of communication outside Central Business District; amortization clause not mentioned). The Eleventh Circuit noted in <u>Ranch House</u> that "[c]ourts elsewhere have generally assumed that a zoning law targeting protected expression must contain a reasonable grandfathering or amortization clause for existing businesses." 238 F.3d at 1286-1287 (citing <u>Ebel v. City of Corona</u>, 767 F.2d 635, 639 (9th Cir. 1985)(finding 60-day amortization period unsatisfactory in light of length of establishment-owner's lease); <u>SDJ v. City of Houston</u>, 636 F. Supp. 1359, 1370 (S.D. Tex 1986), *aff'd.*, 837 F.2d 1268, 1278 (5th Cir. 1988)(use of amortization scheme not only viable, but <u>equitable</u> means of reconciling conflict of interests between public and non-

42

conforming use); Purple Onion, Inc. v. Jackson, 511 F. Supp. 1207, 1224 (N.D. Ga.

1981)(striking down zoning law where amortization provisions, combined with its zoning area

provisions greatly restrict public access to speech protected by First Amendment)).  However, the

appellate court made no finding on the merits of the plaintiff's amortization clause argument

because "the constitutional foundation is unclear and has not been sufficiently addressed by the

parties." Ranch House, 238 F.3d at 1287.

With regard to the amortization clause, competing interests are at stake here.  The first

interest is plaintiff Ranch House's interest in continuous free expression.  It does not appear to

argue that there absolutely are no available conforming sites currently; it instead argues that the

statute's two-month delay does not afford it enough time to relocate to one of them.  Had Ranch

House not challenged the statute and obtained an injunction against its enforcement, but, instead,

operated its business until the two-month delay had run, it could have, consistent with the statute,

been declared a public nuisance.  It then could have been required to, at the very least, cease

operation while it relocated to a conforming site.  For however long the relocation would take,

Ranch House would be prohibited, at the very least, from engaging in its chosen form of free

expression through adult entertainment in its present location.  A countervailing interest is that of

the State of Alabama, which passed the statute in order to prevent the negative secondary effects

of adult entertainment from further plaguing certain surrounding uses, such as private residences,

schools, and churches.  This interest invariably has been held to be substantial, and, at some point,

will override the interests of the purveyor of adult entertainment in continuing to offer that form

of expression in that particular location.  Finally, thrown into the mix, is the public's right to have

access to protected erotic expression, a right that has been mentioned, but not well-defined, in

43

some Supreme Court and Eleventh Circuit case law.[22]  See Young v. American Mini-Theatres,
427 U.S. 50, 73 n. 35, 96 S. Ct. 2440, 2453 n. 35 (1976)(plurality opinion)("The situation would
be quite different if the ordinance had the effect of suppressing, or greatly restricting access to,
lawful speech. Here, however, the District Court specifically found that '[t]he Ordinances do not
affect the operation of existing establishments but only the location of new ones. There are myriad
locations in the City of Detroit which must be over 1000 feet from existing regulated
establishments. This burden on First Amendment rights is slight.'"); Renton, 475 U.S. at 25, 160
S. Ct. at 932 (". . .we have cautioned against the enactment of zoning regulations that have 'the
effect of suppressing, or greatly restricting access to, lawful speech.'"); David Vincent, 200 F.3d
at 1334 (Renton Court's caution against zoning ordinances that suppress or severely limit access
to any protected speech is a factor in determining reasonableness of available site for relocation.).
Application of the above principles would seem to compel a determination of which adult
entertainment establishments will be required to relocate in Calhoun County and whether other,
already existing, conforming adult entertainment establishments would maintain the public's
access to such protected expression.  Furthermore, application of the above principles would
seem to compel a determination of whether, even if the State's zoning ordinance operated
temporarily to close down every adult entertainment establishment in Calhoun County, the
existence of the adult entertainment establishments that are in close proximity to Calhoun County
would not save the statute from "greatly restricting" the Calhoun County citizens' access to adult-
only expression.  After all, inconvenience is not the equivalent of "great restriction."

_____

[22]  Since the parties have stipulated that the application of the statutes would not result in
a total "taking," perhaps the only purpose of an amortization clause would be to provide access to
the erotic message.

The Eleventh Circuit has noted that "the first amendment does not guarantee anyone a profit. It requires only that 'speech,' 'expression,' and 'ideas' be allowed a physically adequate forum." International Food, 794 F.2d at 1526. Furthermore, the Supreme Court has unequivocally placed adult entertainment businesses "on equal footing" with all other commercial enterprises with respect to the real estate market. Renton, 475 U.S. at 54, 106 S. Ct. at 932 ("That respondents must fend for themselves in the real estate market, on equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation."). In the Supreme Court's view, the First Amendment requires no more than that a city or state refrain from passing an ordinance that effectively denies would-be owners of adult entertainment establishments "the opportunity to open and operate an adult entertainment establishment within the city" or state.[23] Id (emphasis added). That a city or state makes some areas available for adult entertainment, but has attempted to "preserve the quality of life in the community at large by preventing those [establishments] from operating in other areas" is "the essence of zoning." Id.

Ranch House has claimed that there is but a small amount of available, conforming real

---

[23] This court queries how accommodating any "amortization" clause would have to be in order to pass First Amendment muster. That the sole requirement is to allow adult establishments the opportunity to open and operate within the regulated area, begs the question of how much "opportunity" an amortization clause must provide, especially in light of the fact that the First Amendment guarantees only the opportunity to communicate in a physically adequate forum, not the opportunity to profit from the communication. Renton, 475 U.S. at 54, 106 S. Ct. at 932 International Food, 794 F.2d at 1526. Implicit in these holdings is the concept that a "physically adequate forum" does not mandate-- if it mandates one at all-- an amortization clause that gives the purveyor of adult entertainment the opportunity to create a grand facility with a marble runway and poles of brightly polished brass, before it can be constitutionally required to vacate its prior, non-conforming premises. Although it is most likely an issue to be decided on a case-by-case basis, surely a forum that is physically adequate for the communication and reception of erotic ideas through the medium of dance requires little more than a space for the dancers to dance and a space for others to observe the dancers.

45

estate in Calhoun County. It also argues that the statue does not contain sufficient safeguards for any and all adult entertainment businesses against the "purposeful encroachment" of churches, schools, and private residences that would 'knock-out' adult entertainment establishments. It is, perhaps, unlikely that a church, school, or private residence would intentionally locate within 1,000 feet of an adult entertainment business for the express purpose of throwing it within violation of the zoning ordinance and forcing it to relocate.[24] The First Amendment does not require legislatures to employ crystal balls or to engage clairvoyants in order to ensure that their statutes will, throughout time, be impervious to constitutional attack, nor does it require reviewing courts to exercise a "sixth sense" to ensure that the statutes will, for all eternity, survive constitutional scrutiny. The Supreme Court has held that the appropriate test for a zoning ordinance that affects establishments that engage in protected expression is whether they are narrowly tailored to further a substantial governmental interest and whether they "allow for reasonable alternative avenues of communication." David Vincent, 200 F.3d at 1333; Renton, 475 U.S. at 50, 106 S. Ct. at 930. The test is whether the restrictions allow for reasonable alternative avenues of communication currently, not whether they always will allow for reasonable alternative avenues of communication. The Eleventh Circuit, by suggesting specific factors for courts to consider in this analysis, has tailored the test in prior cases to the specific characteristics of the locality in question. See David Vincent, 200 F.3d at 1336. Factors include the community's population and size, the percentage of acreage available to adult businesses, the location of available sites, the number of adult businesses already in existence, the number of adult

_____

[24]   Furthermore, this concern could be completely eradicated if the owner of the adult entertainment establishment were to purchase the 1,000 feet surrounding the establishment to hold as a buffer zone.

46

businesses wanting to operate in the community in the future, the community needs, the incidence of adult entertainment establishments in other comparable communities, the goals of the city plan, and the kind of city the plan works toward. Id. These specific factors recognize that each locale is different, and that, over time, each locale has changed and will continue to change. In light of such fluidity of circumstance, the fact that neither the Supreme Court nor the Eleventh Circuit has modified the test to include "safeguards for future change," indicates that this court is to assess the reasonableness of the statute's restrictions and the availability of alternate avenues of communication in the here-and-now.

As to the amortization issue, the court concludes that, with regard to the existing use of the party before it, amortization is an equitable issue for the court to determine. See SDJ v. City of Houston, 636 F. Supp. 1359 (S.D. Tex. 1986). In this light, the court concludes that a period of seven (7) months after the Eleventh Circuit Court of Appeals makes its final ruling, if it upholds the constitutionality as does this court, of § 200.5(4), would be an ample period to allow the plaintiff to relocate. Of course, that period can be increased or decreased by the appellate court at the time it may dissolve its injunction if its ruling is consistent with that of this court.[25]

This court further concludes, based upon the stipulated facts, that there is ample property available in Calhoun County onto which the plaintiff may relocate if need be. It is not up to this court to determine that any such removal would be absolutely convenient or inexpensive. The court does conclude that it would not be confiscatory.

_____

[25] Since there is an Eleventh Circuit injunction in place, it is not necessary for this court to enjoin enforcement for a seven-month period or for any other period. If the Eleventh Circuit Court of Appeals agrees with this court, its injunction as to § 200.5(4) could be extended for seven months or any other period of time that it may determine.

47

## SUMMARY

The court ultimately concludes that both § 200.11 and § 200.5(4) are facially

constitutional as applied to the plaintiff. An appropriate final judgment will be entered.

This _____ day of June 2001,

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

48